# Illinois Official Reports

## Appellate Court

---

**_Gearhart v. Gearhart_, 2020 IL App (1st) 190042**

---

| | |
|---|---|
| Appellate Court Caption | JOHN GEARHART, Plaintiff-Appellee, v. DAVID GEARHART, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>No. 1-19-0042 |
| Rehearing denied<br>Filed | January 14, 2020<br>January 23, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 2015-CH-16093; the Hon. Diane J. Larsen, Judge, presiding. |
| Judgment | Affirmed in part and vacated in part; cause remanded. |
| Counsel on Appeal | David Gearhart, of Schaumburg, appellant *pro se*.<br><br>John C. Martin and Kathryn C. Nadro, of Sugar Felsenthal Grais & Helsinger LLP, of Chicago, for appellee. |
| Panel | PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.<br>Justices Reyes and Burke concurred in the judgment and opinion. |

**OPINION**

¶ 1     The instant appeal arises from a complaint for declaratory judgment filed by plaintiff John Gearhart against his brother, defendant David Gearhart, who was appointed trustee of their late father's trust. The trial court granted summary judgment in plaintiff's favor on count I of the complaint, finding that plaintiff was entitled to a 25% share of the trust's assets. After a bench trial, the trial court also found in plaintiff's favor on count II of the complaint, finding that defendant had breached his fiduciary duty as trustee. The court further found that this breach was willful and imposed a punitive damages monetary award of $250,000. Defendant appeals, and for the reasons that follow, we affirm the trial court's judgment but vacate a portion of its punitive damages award.

¶ 2                                    BACKGROUND

¶ 3                                       I. Trust

¶ 4     On April 30, 1984, Lloyd E. Gearhart (the grantor)[1] established a trust, which provided for a certain distribution of his assets after his death. The grantor had four children: plaintiff, defendant, James Gearhart (also known as Jim), and Susan Tully.[2] The grantor also had an ex-wife, Marjorie Gearhart, and was married to Dorothy Gearhart at the time of his death.[3] Defendant served as trustee of the trust, which was amended twice during the grantor's life.

¶ 5     Under the original trust agreement, the grantor was named as trustee, with the successor trustee taking over upon his death. Article III of the original trust agreement governed the distribution of the trust's assets after the grantor's death. First, paragraph 1 of article III provided that the trustee was to pay such sums as required to fulfill the grantor's obligations to Marjorie pursuant to the judgment for dissolution of their marriage. Next, paragraph 2 of article III provided:

> "[T]he trustee may in its discretion pay to or use for the benefit of the Grantor's descendants so much of the income and principal as the Trustee determines to be required, in addition to their respective incomes from all other sources known to the trustee, for their reasonable support, comfort and education, adding any excess income to principal at the discretion of the trustee. The trustee may make payments to, or for the benefit of, one or more of them to the exclusion of one or more of them, and may exhaust the principal. The Grantor's concern is primarily for the support, comfort and education of his descendants, rather than the preservation of principal for distribution upon termination of the trust. After the death of Grantor and after there is no living child of Grantor under the age of twentyone [*sic*] years, the trustee shall divide the principal, as then constituted, and any undistributed income, into separate trusts, equal in value, one for each then living child of Grantor and one for the then living descendants, collectively, of each deceased child of Grantor."

---

[1]We note that the trust refers to Lloyd E. Gearhart as the "[g]rantor," and we use the same terminology. However, the creator of a trust is also often referred to as the "settlor." See Black's Law Dictionary 1405 (8th ed. 2004).

[2]Since many of the individuals involved share the same last name, we refer to them by their first names for clarity.

[3]The record establishes that the grantor married Dorothy in April 2010.

Paragraph 2 then set forth a formula for distributions, based on the child's age. In summary, until the child was 25, he or she would be entitled to receive trust income in the trustee's discretion; upon turning 25, the trustee was required to make distributions of trust income to the child at regular intervals. After the child turned 25, he or she would also be entitled to request distributions of trust principal, with certain dollar limitations imposed prior to age 27 and age 30.

¶ 6    The first amendment to the trust agreement, dated May 1, 1995, amended the trust agreement to appoint defendant[4] trustee after the grantor's death, followed by Susan as successor trustee. The amendment also amended article III of the trust. Specifically, the amendment substituted a new paragraph 1, which now provided that the trustee was to distribute $100,000 to Western Michigan University. Additionally, the amendment substituted a new paragraph 2, which now provided:

> "The trustee shall distribute the remaining trust principal and any undistributed trust income to the Grantor's descendants that survive him, per stirpes."

¶ 7    The second amendment to the trust agreement, dated January 2, 2012, was executed shortly before the grantor's January 9, 2012, death and again amended article III of the trust agreement. The second amendment provided that "Article III of the Agreement, as amended by the First Amendment, shall remain in full force and effect, subject to the following modifications." First, the new article III provided for the payment of any obligations owed to Marjorie pursuant to the judgment for dissolution of marriage. Second, the new article III provided instructions for the support of Dorothy, including her continued residence in the marital home, the distribution of $100,000 into a separate trust for the costs associated with the home, and the payment of a monthly sum from the trust's income or principal. Finally, the new article III contained the two paragraphs at issue in the instant litigation:

> "3. Notwithstanding any provision of the Trust Agreement or the First Amendment to the contrary, the trustee shall not be obligated to distribute principal, and no child of the Grantor shall have the right to withdraw principal, while any of the foregoing obligations to the Grantor's spouses are outstanding.

> 4. Notwithstanding any provision of the Trust Agreement or the First Amendment to the contrary, no child of the Grantor shall have the right to withdraw principal, unless such child is the legitimate, inside of wedlock, parent of a living descendant of the Grantor."

The second amendment also provided that the grantor resigned as trustee immediately, with defendant succeeding him as trustee. The second amendment ended by providing that, "[e]xcept as modified by this Second Trust Amendment, I reaffirm and ratify the Trust Agreement and the First Amendment."

¶ 8                                        II. Complaint
¶ 9    On November 2, 2015, plaintiff filed a two-count complaint for declaratory judgment against defendant. The complaint alleged that the trust's governing instruments provided that the trust's principal was to be distributed to the grantor's four children *per stirpes* following the satisfaction of other obligations and that defendant had made final distributions to Jim and

---

[4]The record shows that defendant is an attorney, as well as a certified public accountant (CPA).

Susan earlier that year based on the assumption that each of the grantor's children was entitled to an equal share of the trust's assets. However, after making those distributions, defendant's position was that plaintiff was only an income beneficiary of the trust, leaving defendant alone entitled to the remaining trust assets. Accordingly, plaintiff sought a declaratory judgment setting forth the parties' respective rights and ordering defendant to restore any distribution of assets to himself that violated the terms of the trust.

¶ 10    The complaint alleged that defendant was principally responsible for drafting the language of the second amendment and that the grantor died on January 9, 2012, one week after execution of the second amendment, leaving the trust with net assets of over $3 million. The complaint further alleged that, also in 2012, the trust sold the marital home referenced in the second amendment and resolved all further claims of Dorothy to the trust's assets.

¶ 11    The complaint alleged that, between 2012 and 2014, defendant made distributions of the trust's assets to himself and his siblings; as of December 31, 2014, defendant had distributed over $265,000 to Susan, $168,000 to Jim, and $68,000 to plaintiff. Defendant had also distributed over $225,000 to himself, in addition to sums he claimed as investment advisory fees. On March 31, 2015, defendant made a final distribution to Jim of approximately $630,000 in trust assets. According to the complaint,

"[c]onsistent with the understanding that each of [the grantor's] children had an equal share in the Trust's principal, the amount distributed to [Jim] reflected (a) twenty-five percent of the Trust's assets (as of February 6, 2015), (b) less an amount reflecting twenty-five percent of Marjorie's future support obligations, (c) plus an amount relative to tax obligations to be incurred by [Jim], (d) plus an amount intended to compensate [Jim] for having received previous distributions that were smaller than the average distributions made to all four of [the grantor's] children."

¶ 12    Similarly, on March 31, 2015, defendant made a final distribution to Susan of approximately $580,000 in trust assets. According to the complaint,

"[l]ike the final distribution made to Jim, the distribution made to Susan assumed that each of the four children were residuary beneficiaries of the Trust, reflecting (a) a one-third percentage of the Trust's remaining assets (as of June 10, 2015, following the distribution to Jim), (b) less an amount reflecting twenty-five percent of Marjorie's future support obligations (the same amount deducted from Jim's distribution), (c) plus an amount relating to tax obligations to be incurred by Susan. Unlike the distribution made to Jim, however, the distribution to Susan made no allowance for the fact that distributions previously made to her were larger than those made to other beneficiaries."

¶ 13    The complaint alleged that on July 20, 2015, plaintiff, through counsel, wrote to defendant requesting a statement of all receipts and disbursements made from the trust from the date of the grantor's death. Defendant responded by providing information through December 31, 2014, thereby omitting the final distributions to Jim and Susan. On September 3, 2015, after having learned of the agreements entered with Jim and Susan, plaintiff, through counsel, wrote defendant another letter, demanding an updated accounting of the trust's assets. The letter claimed that the agreement with Susan reflected a substantial decrease in the assets of the trust that was unrelated to the final distribution made to Jim and further claimed that the distribution to Susan had potentially served to improperly reduce the amount distributable to defendant because it failed to account for the excess distributions previously made to her. The next day, defendant provided updated financial information, which confirmed that the distribution made

to Susan had not taken in account the previous distributions made to her. The updated financial information also showed that $40,000 of the decrease in the trust's assets was attributable to distributions that defendant had made to himself during the first six months of 2015. These additional distributions brought the total amount of trust assets distributed to defendant to over $278,000, which was $200,000 more than had been distributed to plaintiff.

¶ 14    The complaint alleged that on September 22, 2015, plaintiff, through counsel, again wrote to defendant, asking for an explanation for the unequal distributions to beneficiaries and for an explanation of defendant's plan to reconcile these distributions so that the *per stirpes* distribution required by the trust documents was effectuated. In response, defendant suggested that plaintiff was only an income beneficiary of the trust and had no right to principal unless defendant, as trustee, chose to make such distributions to him in his discretion; plaintiff included correspondence setting forth these positions as exhibits to the complaint. The complaint alleged that this interpretation was inconsistent with the trust documents and was also inconsistent with the final distributions made to Jim and Susan, which were calculated based on the assumption that the four children had an equal claim to the trust assets. According to the complaint, defendant's position would leave him as the sole remaining residual beneficiary of the trust, entitling him to the entirety of the trust assets after Marjorie's support obligations were satisfied.

¶ 15    Count I of the complaint sought a declaratory judgment that plaintiff was entitled to a 25% interest in the trust's income and principal, subject only to the satisfaction of the obligations to Marjorie and Dorothy. Count I sought a court order declaring:

"A. That the Trust Instruments afford [plaintiff] a 25% share of the Trust's assets after the obligations to Marjorie and Dorothy are met;

B. That [defendant] has no right as Trustee to distribute [plaintiff's] share of the Trust's assets to himself, to any other beneficiary of the Trust, or to any other person; and

C. Granting [plaintiff] his costs of suit, including reasonable attorneys' fees, and such other and further relief as may be proper."

¶ 16    Count II of the complaint alleged that defendant had breached his fiduciary duty as trustee by making distributions to himself and to others in violation of the trust instruments' terms, which served both to enrich defendant and to diminish plaintiff's share of the trust's assets. Count II also alleged that defendant's position that he was the sole remaining residual beneficiary of the trust suggested that he would engage in further acts of self-dealing by making further distributions of trust assets to himself. Additionally, count II alleged that defendant's inconsistent positions when addressing Jim and Susan as compared to plaintiff showed that defendant was not acting in good faith but was acting with the intent to enrich himself at the expense of other trust beneficiaries. Accordingly, count II sought an order requiring defendant to provide a full accounting of all distributions made from the trust, to restore to the trust any distributions made in violation of the trust instruments' terms, with interest, and to preclude him from making any further distributions of the trust's assets in violation of the terms. Count II also requested the imposition of a constructive trust on any trust assets improperly distributed

by defendant to himself or his family, as well as the removal of defendant as trustee and an award of attorney fees and costs.[5]

¶ 17　　On November 30, 2015, defendant filed an answer, affirmative defenses, and counterclaim. In his answer, defendant denied the material allegations of the complaint but admitted that he was principally responsible for drafting the second amendment, albeit at the request of, and under the direction of, the grantor. Defendant also admitted that the net assets of the trust at the time of the grantor's death were $3.026 million, that Dorothy's claims to the trust's assets had been resolved, and that he had made full and final distributions to Jim and Susan in 2015. As affirmative defenses, defendant raised his reasonable reliance on the trust instruments, the business judgment rule, unclean hands, failure to state a claim, lack of damages, and "Other Affirmative Matter: Grantor's Intent."

¶ 18　　Defendant also raised two counterclaims. Count I of his counterclaim sought a declaratory judgment and alleged that plaintiff had been estranged from the grantor prior to his death, leading the grantor to restrict plaintiff's withdrawal rights. Count I alleged that the grantor recognized that this would likely lead to resentment directed at the trustee, leading the grantor to insert an "incontestability clause" into the second amendment, which provided that any beneficiary unsuccessfully contesting the terms of the trust documents would not be entitled to any of the trust's assets. Specifically, the clause provided, in relevant part:

> "Should any beneficiary of the trust contest the validity of the trust or institute any proceedings to contest the validity of the trust or any provisions thereof or institute any proceedings to construe any provision of the trust and such proceedings are deemed to be without merit by any court or to prevent any provision of the trust from being carried out in accordance with its terms (whether or not in good faith and with probable cause), then all the benefits provided for such beneficiary in the trust are revoked and annulled and such beneficiary and all said beneficiary's descendants shall be presumed to have pre-deceased the Grantor and the benefits which such beneficiary and all his or her descendants would have received if he or she had made no such contest or brought such proceeding shall go under my residuary clause as if such beneficiary and all said beneficiary's descendants predeceased the Grantor."

¶ 19　　Count I alleged that the grantor sought to minimize any resentment by discussing the terms of the second amendment with plaintiff in January 2012 and plaintiff indicated that he was not concerned with the trust's terms. Count I further alleged that, after the grantor's death, plaintiff had indicated that he accepted his status under the trust documents until he later "became embittered and refused to communicate further" with defendant and filed the instant lawsuit. Accordingly, count I sought a declaration that plaintiff had violated the incontestability clause and was entitled to no further benefits under the trust.

¶ 20　　Count II of the counterclaim was for breach of contract, alleging that the trust documents and the incontestability clause constituted a unilateral contract, which plaintiff accepted by receiving distributions from the trust. Count II alleged that plaintiff breached this contract by filing the instant complaint and, therefore, the trust had no further obligations to him.

¶ 21　　Attached to the counterclaim were two affidavits by defendant, in which defendant averred that plaintiff, by choice, had been estranged from the grantor since December 1999 and had

---

[5]At the beginning of trial, count II was amended to also seek punitive damages; the amendment is not included in the record on appeal, but there is no dispute that plaintiff sought punitive damages.

briefly reconciled with the grantor only a few times over the years, totaling no more than a few weeks combined. Defendant averred that plaintiff had likewise estranged himself from the rest of his family. According to defendant, on January 1, 2012, while he was visiting the grantor at his home, the grantor asked him to amend his trust. One of the amendments the grantor contemplated was disinheriting plaintiff, which defendant averred was "based on our mutual understanding and shared experience that [plaintiff] had long been estranged from the Grantor and other family members." They also discussed the grantor's concern that, since plaintiff did not have any children of his own, any principal distributed to plaintiff would likely end up being gifted to persons unknown to the grantor. Defendant averred that he "advised Grantor that he probably didn't need to go to the extreme of disinheriting [plaintiff] outright. Instead we could amend the trust to prevent [plaintiff] from demanding principal withdrawals." Defendant averred that "[plaintiff] would still receive income from the Trust, and [defendant] as Trustee would retain the discretion [to] stay in touch with him and make principal distributions as warranted." Defendant averred that he further advised the grantor that they did not need to single out plaintiff by name but could generally restrict the withdrawal rights of the grantor's children who did not have children of their own; plaintiff was the only child who met this criterion. The trust was amended to reflect defendant's suggestion, and the grantor explained the decision to plaintiff when he made his final visit to the grantor on January 4, 2012.

¶ 22 On January 15, 2016, plaintiff filed a motion to strike defendant's affirmative defenses and to dismiss his counterclaim under section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2014)), claiming that none of the affirmative defenses or counterclaims provided either a legitimate defense to the claims asserted by plaintiff or a basis for affirmative, declaratory, or other relief given the undisputed terms of the trust instruments.

¶ 23 On April 21, 2016, the trial court granted plaintiff's motion to strike and dismiss and gave defendant leave to replead his unclean hands defense and his counterclaims. On May 24, 2016, defendant filed an amended answer, affirmative defenses, and counterclaims, alleging two affirmative defenses and repleading the two counts of his counterclaim.

¶ 24 On June 16, 2016, plaintiff filed a motion to strike defendant's amended affirmative defenses and to dismiss the amended counterclaim, alleging that defendant had failed to correct the defects from the earlier pleadings, merely repeating the same arguments that had previously been rejected. On September 29, 2016, the trial court granted plaintiff's motion to strike and dismiss and gave defendant leave to replead them; defendant did not do so.[6]

¶ 25                                        III. Motions for Summary Judgment
¶ 26 As the trial court's orders concerning summary judgment are at issue on appeal, we discuss the summary judgment proceedings in some detail.

¶ 27                              A. Defendant's Motion for Partial Summary Judgment
¶ 28 On October 13, 2016, defendant filed a motion for partial summary judgment as to count I of plaintiff's complaint. Defendant claimed that there was no disagreement over the fact that the trust documents required the principal of the trust to be divided into separate trusts, equal

---

[6]At the beginning of trial, defendant sought to add a counterclaim, which the trial court granted. The counterclaim is not included in the record on appeal but appears to be for promissory estoppel.

in value, for each then-living child of the grantor. However, defendant claimed that distributions of the trust assets were subject to both the postponement of withdrawal set forth in the second amendment's article III, paragraph 3, and the restriction on withdrawal set forth in article III, paragraph 4. Defendant claimed that, with respect to plaintiff, neither condition had been met—plaintiff had no descendants and Marjorie was still living—so the two clauses operated to restrict plaintiff's access to trust principal.

¶ 29 Defendant claimed that he had discretion to make discretionary distributions of principal under article III, paragraph 2, of the original trust agreement, which also postponed beneficiary withdrawal rights until the beneficiary reached the age of 21. Defendant acknowledged that this paragraph had been removed by the first amendment, which replaced the paragraph with one providing for immediate distributions of trust principal. However, he claimed that "that part of the First Amendment was negated when the Second Amendment reinstated postponement of withdrawal rights (this time using the life of Marjorie Gearhart as the measurement period)." Defendant argued that "[i]t is reasonable and consistent to conclude that the Trustee's power to make discretionary distributions of principal was also reinstated; the contrary provisions of the First Amendment being rendered null and void."

¶ 30 Defendant also claimed that the grantor demonstrated his intent to treat plaintiff differently than other beneficiaries through the language of the second amendment, since plaintiff was the only beneficiary with no children and, therefore, the only beneficiary to whom the plain terms of the second amendment's article III, paragraph 4, would apply. Additionally, if the intent was not apparent from the plain language of the trust documents, defendant claimed that the intent could be discerned from the circumstances under which the second amendment was made, including plaintiff's relationship with the grantor. Defendant pointed to his affidavit, in which he set forth details of plaintiff's estrangement from the grantor. Defendant also claimed that these restrictions and the discretion afforded defendant were reasonable, fair, and in accordance with public policy.

¶ 31 In support of his motion for summary judgment, defendant attached copies of the trust documents, as well as the same affidavits that he had attached to his counterclaims.

¶ 32 On January 25, 2017, the trial court granted plaintiff leave to depose defendant prior to responding to defendant's motion for summary judgment, which plaintiff did. On April 11, 2017, plaintiff filed a response in opposition to defendant's motion, claiming that neither the terms of the trust instruments nor the evidence entitled defendant to judgment as a matter of law. Plaintiff claimed that defendant was conflating the restrictions on distributing principal with the restrictions on withdrawing principal, noting that the second amendment's article III, paragraph 4, contained no language directed at defendant's obligation to distribute principal but only restricted plaintiff's right to withdraw principal. Since the second amendment's article III, paragraph 3, discussed both distributions and withdrawals, plaintiff argued that the use of only the word "withdraw" in paragraph 4 must be interpreted to have significance. Plaintiff also noted that the term was not defined in the trust documents and that there were several plausible explanations of the grantor's intent in using that term. Plaintiff also argued that defendant's claims that he had discretion to make distributions of principal found no support in any of the trust documents.

¶ 33 Plaintiff also claimed that defendant's evidentiary claims concerning the grantor's intent were disputed. In support, plaintiff attached defendant's deposition testimony, plus affidavits from plaintiff, Jim, and Susan. Defendant's deposition testimony was largely consistent with

his affidavit, setting forth the circumstances under which the second amendment was executed and discussing the grantor's relationship with his children. Defendant testified that the second amendment was executed while he was in Arizona, visiting the grantor following the grantor's diagnosis of terminal cancer. The grantor brought up the issue, telling defendant that he wanted to amend the trust for several reasons, including providing for his current wife and "restricting a distribution for one of his sons and postponing the distribution for another of his sons." Defendant and the grantor had several conversations concerning the issue, with defendant creating drafts, which the grantor would then review along with Dorothy and revise if necessary; the drafting process took approximately two days. Defendant and the grantor were alone when they discussed the trust's treatment of plaintiff, but Dorothy was present when they discussed the provisions concerning her.

¶ 34       With respect to the second amendment's article III, paragraph 3, defendant testified that the purpose of the paragraph was to prevent Jim from demanding his principal prior to age 60; defendant testified that he and the grantor used the obligations to the grantor's spouses as a proxy for the time of the delay instead of specifying a certain age. Defendant testified that the intent of paragraph 3 was to permit defendant to retain Jim's share in the trust until that time, which also served the practical purpose of ensuring that there was sufficient principal remaining in the trust while the trust was obligated to make monthly payments to the spouses. Defendant could not recall why they chose the specific terms "distribute" and "withdraw" but testified that "one is focused from the point of view of the beneficiary, and the other is focused from the point of view of the trustee. The right to demand accrues to the beneficiary. The obligation to distribute applies to the trustee." Defendant further testified that he was not obligated to make a distribution unless there was a demand for a distribution.

¶ 35       With respect to the second amendment's article III, paragraph 4, defendant testified that it was aimed at plaintiff, as he was the only child of the grantor who did not have children.[7] The grantor did not inform defendant about why he wished to include the provision, but defendant testified that, "[w]hen he mentioned should we disinherit [plaintiff], I knew why. It was based on our shared experience with [plaintiff] being long estranged from the family. He did not need to provide me with an additional explanation because I knew what he meant."

¶ 36       Defendant testified that he did not recall there being any significance to the decision to omit any reference to an obligation to distribute in paragraph 4. Defendant further testified that, after all obligations to Marjorie were satisfied, plaintiff would still have no right to demand distribution of the trust principal but defendant would have the discretion to distribute the principal to him. Defendant acknowledged that he was "not aware of anything prohibiting" him from simply holding on to the principal until plaintiff died. Defendant testified that, should that happen, then plaintiff's share of the principal would be added to the shares of the other beneficiaries; since Jim and Susan had already resolved their claims to the trust's assets, the only remaining beneficiary under the trust would be defendant himself. Defendant testified that the grantor informed him that he spoke with plaintiff, Jim, and Susan about the terms of the trust documents; defendant was not present for these conversations.

_____

[7]Plaintiff's counsel indicated at the deposition that plaintiff was unable to father children after treatment for a previous cancer diagnosis, but defendant denied being aware that plaintiff would never be able to father children.

¶ 37    As noted, also attached to the response to the motion for summary judgment were several affidavits. In plaintiff's affidavit, he averred that he was not estranged from the grantor; although he was not in regular contact with the grantor between 2001 and 2009, they renewed contact in 2009, after which plaintiff visited the grantor several times. Plaintiff also had regular contact with Susan and Jim but was estranged from defendant, who he characterized as "physically and verbally abusive" to him. Plaintiff averred that his final visit with the grantor was shortly before his death; at no time did the grantor discuss any changes to the trust, nor did he indicate that the trust treated plaintiff any differently than his siblings.

¶ 38    In her affidavit, Susan averred that she was in regular contact with the grantor during the time preceding his death and that each of her brothers visited the grantor prior to his death. Susan averred that she was aware that, during defendant's visit, the grantor and defendant amended the trust documents in order to address some of Dorothy's concerns. Susan averred that she had spoken to the grantor multiple times about his financial affairs and that he had often told her that the trust would provide for an equal division of his assets among his four children after his death; he never suggested to her that he intended to alter that distribution. Susan also heard the grantor tell her husband that his arrangements "would make sure [their] children could get through school." Susan also averred that plaintiff and the grantor had reconciled at least a year or two prior to the grantor's death and that her observations of their interactions during plaintiff's visit were consistent with a reconciliation. After the grantor's death, defendant informed Susan that he needed to be careful in paying out any of the trust's assets to her because, if he did, plaintiff and Jim would also want to receive money. Susan averred that defendant informed her that he specifically did not want to pay plaintiff because, if the assets remained in the trust after plaintiff died, " 'our kids would get it.' "

¶ 39    Finally, in his affidavit, Jim averred that he was generally aware that an amendment had been prepared prior to the grantor's death but he did not read the amendment until sometime after his death. Jim averred that at no point did the grantor inform him that the amendment was in any way intended to alter his rights or those of plaintiff. Jim's understanding was that the sole purpose of the amendment was to take care of Dorothy. Jim averred that he had a close relationship with the grantor and that the grantor had informed him of his intention to divide his assets equally among his children after his death. The grantor never suggested to Jim that he had any intention of changing his estate plans due to plaintiff's lack of children.

¶ 40    In his reply in support of his motion for partial summary judgment, defendant argued that the affidavits submitted by plaintiff did not contradict the evidence he presented, as none of the other siblings had been present during the discussions about the amendment. Instead, defendant attached the affidavit of Dorothy, who he claimed was present during such discussions, as well as an additional affidavit in which defendant disputed the claims in his siblings' affidavits. In her affidavit, Dorothy averred that she had witnessed the grantor's relationships with each of his children during her marriage and that the grantor frequently shared his thoughts and feelings toward them to her. She averred that the grantor had a "continuously good" relationship with defendant and his family. However, the grantor was estranged from plaintiff at the time that Dorothy met the grantor in April 2008. The grantor informed Dorothy early during their relationship that plaintiff had not been in communication with him for several years, and Dorothy observed that this created a "very emotional and disturbing situation" for the grantor. The first time that plaintiff called their home was in the summer of 2011; Dorothy denied intercepting any previous calls from plaintiff.

¶ 41     Dorothy averred that she was present when defendant visited the grantor in December 2011 and January 2012 and was present when the grantor asked defendant to revise certain terms of the trust documents. Defendant drafted the second amendment to the trust documents and presented drafts to the grantor for his approval, which the grantor discussed with Dorothy; the revision process took one to two days, and they "had plenty of time to ask [defendant] to explain certain terms and to make certain revisions." Dorothy averred that she and the grantor discussed the terms of the second amendment that changed the withdrawal rights of his children. Dorothy averred that

> "[the grantor] told [her] these were specifically intended toward [plaintiff] and Jim. [The grantor's] main concern was to leave enough money to ensure that all his grandchildren would have a good college education. Jim was estranged from his wife and son, and [plaintiff] did not have any children. This was one of the reasons [the grantor] revised his Trust to restrict [plaintiff] and Jim's distributions."

¶ 42     On June 30, 2017, the trial court denied defendant's motion for partial summary judgment. While the order did not set forth the court's reasoning, during the hearing on the motion, the trial court found that it would look only to the terms of the trust agreement and had no need to consider extrinsic evidence. In doing so, the court found that, although the second amendment included a restriction on the right to withdraw, that did not eliminate the obligation to distribute that was included in the trust documents. The court further found that the trustee's discretion to distribute principal had previously been eliminated. Accordingly, the trial court denied defendant's motion.

¶ 43     On July 28, 2017, defendant filed a notice of appeal. On July 31, 2017, defendant filed a motion to reconsider or, in the alternative, a motion for leave to appeal from the June 30, 2017, order under Illinois Supreme Court Rule 308 (eff. July 1, 2017) or on "another permissive basis."[8] On September 6, 2017, the trial court denied the motion in its entirety. During the hearing on the motion, the court informed defendant's counsel:

> "The Motion to Reconsider is denied. This is not an appealable order, because the denial of a Motion for Summary Judgment is not automatically appealable. There has been no judgment entered in anyone's favor. There hasn't been a judgment entered in the Plaintiff's favor. It is simply a denial of a Summary Judgment to be entered in the Defendant's favor and that would not be appealable."

¶ 44                    B. Defendant's Second Motion for Partial Summary Judgment

¶ 45     On January 26, 2018, defendant filed another motion for partial summary judgment on count I of the complaint. Defendant reiterated the arguments made in his first motion for summary judgment, namely, that plaintiff had no right to demand distribution of trust principal but could demand distribution only of trust income and that defendant had the discretion, but not the obligation, to make principal distributions to plaintiff.

¶ 46     Attached to the motion for partial summary judgment were the documents that had previously been attached to defendant's initial motion for partial summary judgment and the reply in support of that motion, including defendant's affidavits and Dorothy's affidavit. Also attached to the motion was the transcript of plaintiff's discovery deposition. In his deposition,

_____

[8]The motion stated that defendant had filed the notice of appeal several days earlier due to the 30-day time limit for filing a notice of appeal.

plaintiff testified that he had been unemployed since 2014 and that his sole source of income since that time had been distributions from the trust; plaintiff had been receiving $1500 a month from the trust between August 2012 and October 2017. Plaintiff further testified that there was a period of eight years in which he had no contact with the grantor and that he had no communication with Marjorie, his mother. Plaintiff testified that he reconciled with the grantor in the summer of 2011. During his last visit, the grantor brought up finances, but plaintiff told him not to worry about it and that he would speak to defendant about it; plaintiff was not aware that the grantor had a trust until after the grantor's death.

¶ 47        In response, in addition to arguments concerning the terms of the trust, plaintiff argued that the evidence showed that the grantor did not intend to disinherit him. Plaintiff attached the transcripts of the depositions of both Dorothy and Marjorie in support. In her deposition, Dorothy's testimony was consistent with her affidavit. She testified that she was present for approximately four conversations about the trust between the grantor and defendant and that she and the grantor also discussed the issue a number of times privately; she was not aware if there were any private conversations between the grantor and defendant, but she assumed that there were. The grantor never discussed disinheriting either Jim or plaintiff with Dorothy, and she was not present for any conversation between the grantor and plaintiff.

¶ 48        In her deposition, Marjorie testified that she was unaware that the grantor had established a trust and that he did not discuss the terms of the trust with her. She further testified that the last contact she had with Susan was in October 2006 and that the last contact she had with plaintiff was in January 2003. The last contact she had with Jim was the previous weekend, but prior to that, she had no contact for the prior two years. She had contact with defendant "[q]uite often." Marjorie testified that the grantor also had challenging relationships with his children, but that, despite that, he expressed in 2008 that he would never disinherit them.

¶ 49                              C. Plaintiff's Motion for Partial Summary Judgment

¶ 50        Also on January 26, 2018, plaintiff filed a motion for summary judgment on count I of the complaint, claiming that the language of the trust unambiguously demonstrated plaintiff's rights to the trust principal and defendant's lack of discretion in making distributions. Plaintiff argued that the restriction on withdrawal set forth in article III, paragraph 4, of the second amendment did not eliminate the requirement that the trustee distribute the principal to the beneficiaries upon the satisfaction of the obligations to Marjorie and Dorothy. Plaintiff pointed to the fact that paragraph 3 referenced both distribution and withdrawal but paragraph 4 referenced only withdrawal, arguing that the difference in terminology must be interpreted to have significance. Plaintiff further argued that the trust documents contained no reference to the trustee's discretion in making such principal distributions, even though the trustee was specifically afforded discretion elsewhere in the trust documents. Plaintiff also sought a finding that not only did defendant lack discretion to distribute trust principal in general, he specifically lacked the discretion to withdraw principal himself. Plaintiff claimed that defendant had distributed nearly $500,000 to himself since the denial of defendant's first motion for summary judgment and sought a finding that defendant lacked the discretion to make distributions to himself while the obligations to Marjorie remained outstanding.

¶ 51        In response, defendant argued that plaintiff and the other beneficiaries had never suggested that the prior discretionary distributions made by defendant were done without authorization under the terms of the trust; instead they accepted the payments. Defendant also claimed that

the omission of an express provision restoring the trustee's discretion to make distributions was inadvertent. Defendant further claimed that the absence of the word "distribute" in paragraph 4 was a mere scrivener's error and that neither he—the drafter of the amendment— nor the grantor intended the absence of that language to have any legal effect. At a minimum, defendant argued that the absence of the word created an ambiguity that needed to be resolved by ascertaining the grantor's intent.

## D. Trial Court Order

On April 25, 2018, the trial court entered an order on the parties' cross-motions for summary judgment on count I of the complaint. The order provided, in full:

> "1. Plaintiff's Motion for Summary Judgment on Count I is granted for the reasons stated in Plaintiff's motion;
>
> 2. Defendant's Motion for Summary Judgment on Count I is denied;
>
> 3. The Declaration issued is in accordance with the relief requested in Count I except for the request for attorneys' fees; and
>
> 4. The matter is set for status on May 31, 2018 at 9:30 am."

The "relief requested in Count I" as referenced in the order was a declaration providing:

> "A. That the Trust Instruments afford [plaintiff] a 25% share of the Trust's assets after the obligations to Marjorie and Dorothy are met; [and]
>
> B. That [defendant] has no right as Trustee to distribute [plaintiff's] share of the Trust's assets to himself, to any beneficiary of the Trust, or to any other person."[9]

On May 22, 2018, defendant filed a notice of appeal from the trial court's order. On August 2, 2018, defendant filed a motion to stay the trial court proceedings while the appeal was pending. Defendant argued that the entry of summary judgment on count I prejudiced his defense on count II of the complaint, which was based on violation of fiduciary duty. In the alternative, defendant sought a continuance of the trial date. On August 6, 2018, the trial court denied defendant's motion to stay or continue.[10]

## IV. Trial

The parties proceeded to trial on count II of the complaint, and the trial court conducted a bench trial from August 13 to August 15, 2018. As the trial court's judgment on count II is at issue on appeal, we discuss the trial proceedings in detail.

## A. Plaintiff

Plaintiff testified on his own behalf, including a summary of his life showing that he had no contact with the grantor between 2001 and 2010; that he worked as a chef, which caused his marriage to fail; and that he was also diagnosed with cancer, which rendered him unable to work and resulted in his home being foreclosed upon. Plaintiff testified that he renewed contact with the grantor after Susan invited plaintiff to the grantor's Michigan home, where she was

---

[9]As noted in the order, count I also included a request for attorney fees and costs, which was not granted.

[10]Defendant's appeal was dismissed for lack of jurisdiction on September 12, 2018.

visiting with her children. After that, plaintiff visited the grantor in his Michigan home a half-dozen times; defendant was not present during those visits. The grantor also offered plaintiff $10,000 to help with his financial issues. When he heard of his father's illness, he visited the grantor in January 2012, and the grantor told him during the course of the visit that he would ensure that "[they] all had some money at the very beginning after he passed away." Plaintiff did not think that it was an appropriate time to discuss money and told the grantor that he would speak about it with defendant at a later time.

¶ 59    Approximately six months after the grantor's death, after a request by plaintiff, defendant indicated that plaintiff had a 25% beneficial interest in the trust and sent him a copy of the trust documents. Plaintiff examined the trust documents and noticed that they appeared to "single [him] out," which upset him. However, he did not have any further understanding of the meaning of the provision.

¶ 60    On January 20, 2012, defendant made a $25,000 distribution to plaintiff and then made another distribution to plaintiff of $25,000 in July 2012, when plaintiff needed funds to purchase a leased vehicle. Defendant noted in a letter that "[t]hese sums represent advances of several years' worth of monthly income that might otherwise have been distributable to you." Plaintiff testified that he had never asked defendant about receiving regular monthly distributions of trust income.

¶ 61    Plaintiff testified that he was unaware of any distributions being made to his siblings and had not been in contact with his siblings. He renewed contact with them after Jim called him and left a message saying that he had settled his interest in the trust and that plaintiff should call him. Plaintiff returned Jim's call, and Jim updated him on the conversations he had with defendant. Jim also offered to help plaintiff with legal fees so that plaintiff could pursue the same type of settlement; plaintiff testified that he had not previously sought legal assistance because he could not afford legal fees.

¶ 62    On cross-examination, plaintiff testified that he had no children and was unemployed at the time of the grantor's death. Plaintiff denied that the grantor intended to treat him differently than his siblings and denied ever referring to himself as a "second class citizen with lesser rights." Plaintiff testified that he did not recall ever asking defendant for a distribution from the trust and testified that he was receiving $1500 per month from the trust.

¶ 63                                                    B. Jim

¶ 64    Jim testified on plaintiff's behalf that he had discussed the grantor's estate plans with the grantor "[o]n many occasions," the last being prior to the grantor's marriage to Dorothy. At that time, he informed Jim that his plans were for all four children to share in the trust assets. Jim testified that plaintiff had been estranged from the grantor for a period of time but that it was "not at all" odd for the grantor to nevertheless provide an inheritance for him "[b]ecause he's not that kind of guy." Jim further testified that his relationship with the grantor and the grantor's relationship with Susan were "off and on, hot and cold all the time."

¶ 65    Jim testified that he was first provided with the trust documents in a July 2012 e-mail from defendant. Jim further testified that he received distributions from the trust. At one point, he learned that Susan had received a large sum of money from the trust to pay off her mortgage, and Jim raised the issue with defendant, who gave him $100,000.

¶ 66      Jim testified that, in February or March 2013, he was out to dinner with defendant one night and brought up plaintiff, asking why he was not receiving the same distributions as the rest of his siblings. Defendant responded that plaintiff "will never receive a dime of that money." Jim brought up plaintiff again in future conversations, and defendant gave responses "to make [Jim] think that he was being taken care of."

¶ 67      Jim testified that, in May 2013, defendant sent him an e-mail indicating that he would be receiving a monthly transfer of $750 from the trust. Jim responded to defendant, indicating that defendant had reversed a previous stance he had taken, and asked for additional information, which defendant provided. Jim also suggested purchasing an annuity for Marjorie, eliminating the need for the trust's obligations to her, but defendant rejected that suggestion. Defendant informed Jim that the grantor felt that Jim had a poor work ethic and did not want him to have access to the trust funds until he was of normal retirement age. Jim did not believe defendant's explanation "at all," and the grantor had never suggested those feelings to Jim. Jim then immediately retained an attorney to protect his interests.

¶ 68      Jim testified that, after the Michigan house was sold, he saw no reason for the continued existence of the trust, so he asked his attorney to attempt to resolve his interest in the trust and ultimately executed a settlement agreement. After he received his settlement, he reached out to plaintiff and told him that he would support him "and make sure that he got was rightfully his." Jim felt that the way that plaintiff was being treated was wrong and, based on his history with defendant, suspected that defendant "was doing something underhanded." Jim testified that he had paid for plaintiff's counsel in the instant lawsuit.

¶ 69      On cross-examination, Jim testified that the grantor had provided him with financial assistance many times throughout his life, as was also true of the rest of his siblings. Jim further testified that he lived with the grantor at his Michigan home during the summer of 2011 due to Jim's marital problems.

¶ 70                                  C. Defendant

¶ 71      Finally, plaintiff called defendant as an adverse witness. Defendant testified that he drafted the second amendment to the trust, based on conversations with the grantor during his final visit. Defendant testified that, at the time the amendment was drafted, he had been practicing law for approximately 10 years and that roughly 20% of his practice was devoted to drafting trusts, wills, and similar estate documents. Defendant further testified that he was aware that the first reference for determining the grantor's intent was the language of the trust documents. Defendant did not take any notes of his conversations with the grantor, nor did he keep any prior drafts of the second amendment.

¶ 72      Defendant testified that the second amendment's article III, paragraph 3, was inserted to prevent certain children from receiving money; however, it did not name them specifically but merely as members of a class. Defendant testified that, under this paragraph, no beneficiary, including himself, could demand withdrawal of trust principal.

¶ 73      Defendant testified that, in addition to being an attorney, he was also a CPA. He handled the financial accounts of the trust using accounting software, and all transactions were input into the system. Defendant identified a number of exhibits as reports generated by the software, including ledgers, profit-and-loss statements, and balance sheets. Defendant testified that the trust maintained two accounts with TD Ameritrade, an individual retirement account (the IRA) and a nonqualified "trust" account. Defendant testified that there were withdrawals from both

accounts that were paid to Advantage Advisory, an investment firm that defendant operated, which were fees paid to him in his capacity as an investment advisor. Defendant further testified that the TD Ameritrade statements showed a monthly payment of $1200 from the trust account to Marjorie for her support obligations and that, between January 2, 2018, and July 27, 2018, $10,500 had been paid to plaintiff from that same account. There were also payments to Advantage Law, defendant's law firm, as well as payments to defendant's counsel in the instant litigation and tax payments. Defendant testified that the trust documents did not require him to serve as the trust's investment advisor or attorney but that he chose to take on those roles and charged below-market rates.

¶ 74    Defendant testified that he had prepared a record of capital accounts, which reflected the value of the property in the trust and any distributions made from the trust between January 10, 2012, and July 31, 2018. The beginning balance showed that, as of the day after the grantor's death, the trust's assets had a value of $3,026,106. The report was then divided into four columns, one for each child, which showed that the beginning balance resulted in $756,527 per child. The report then showed what distributions were made to which child on which date. Defendant testified that, between January 16 and January 23, 2012, he made an initial distribution of $25,000 to each child.

¶ 75    Defendant testified that, in September 2012, Susan requested that the trust pay off the mortgage to her home and defendant directed the trust to make that payment. Defendant testified that the payment was made from trust principal, not income. Defendant testified that, under the second amendment's article III, paragraph 3, Susan did not have a right to withdraw the funds and defendant did not have an obligation to make the distribution, but that he chose to do so anyway. In November 2012, defendant also gave himself a distribution and gave Jim $100,000, both from trust principal. Defendant testified that, in 2012, all four beneficiaries received $50,000 in distributions and then Jim, Susan, and defendant also received additional distributions in excess of their *pro rata* shares. Defendant testified that, according to the report, plaintiff "received far less than everyone else" in distributions.

¶ 76    Defendant testified that he understood that he owed a fiduciary duty to his siblings as trustee of the trust, including duties of full disclosure. He testified that, when he received a letter from plaintiff asking for confirmation that he was a beneficiary under the trust, he accurately responded that plaintiff was entitled to a quarter of the trust's assets. Defendant testified that he did not feel that he needed to inform plaintiff that his right to distributions of the trust principal was further limited by the trust documents; he testified that he provided plaintiff with the trust documents and plaintiff would be able to ask further questions or hire an attorney if he wished to do so. Defendant further testified that he did not inform beneficiaries about distributions that were being made to other beneficiaries.

¶ 77    Defendant testified that, in May 2013, he received an e-mail from Jim asking questions about the trust. In his response, defendant included a statement that he would not be purchasing an annuity for Marjorie to eliminate the trust's obligations to her, as Jim had suggested. Defendant testified that doing so "would defeat an essential purpose of the trust, which was to stop him from squandering his money before age 60." Shortly thereafter, defendant was contacted by Jim's attorney and, after the sale of the Michigan house, settled Jim's interest in the trust in 2015. After the settlement with Jim, defendant contacted Susan to afford her the same opportunity and settled with her, as well. Defendant testified that, in settling their

interests, defendant took into account that Jim had received smaller distributions than others but did not take into account that Susan had received larger distributions.

¶ 78    Defendant testified that paragraphs 3 and 4 of the second amendment's article III did not use the word "discretion" but testified that paragraph 3's statement that the trustee did not have an obligation to distribute was the same as saying that "I could, although I'm not forced to." Defendant further testified that, even after the obligations to Marjorie were satisfied, paragraph 4 restricted plaintiff's right to distributions of principal. Defendant testified that he had the right to withhold principal from plaintiff but that it was not absolute discretion; defendant testified that, if there was a reason for a distribution, he would make it.

¶ 79    Defendant testified that, after the filing of the instant lawsuit, he continued to make distributions to himself. He further testified that, less than a month after the trial court had denied his motion for summary judgment on June 30, 2017, he distributed nearly $400,000 to himself; he testified that he was aware only of the order denying summary judgment, which merely said the motion for summary judgment was denied and was unaware of the transcript from the hearing, at which the court found that the trustee's discretion in making distributions had been eliminated. Defendant testified that the reason he made this distribution was because he knew that there was a possibility that Susan would become the trustee of the trust and she was hostile to defendant. Defendant testified that, at this point, he had distributed to himself approximately the same amount as Jim and Susan.

¶ 80    On cross-examination, defendant testified that he had attempted to treat all of the siblings equally and did so for the first six months after the grantor died, but then Susan "made a very, very strong pitch" for him to pay off her mortgage. Defendant testified that he made the payment to her, as well as the $100,000 payment to Jim, in the interest of family harmony. Defendant further testified that he had paid plaintiff $132,500 to date as of July 31, 2018.

¶ 81    After defendant's testimony, plaintiff rested, and defendant made a motion for a directed finding, which was denied. Defendant then testified on his own behalf.

¶ 82    Defendant testified that, upon the grantor's death, the trust contained several non-income-producing assets, namely, the grantor's Arizona and Michigan homes. There were also obligations to the grantor's spouses, which would result in the beneficiaries' money being deferred for quite some time, and "none of them were very happy about that from the onset. They wanted their money right away and they were resentful from the get go." Defendant testified that, at the time that the grantor was diagnosed with cancer, he was the only child speaking to the grantor and he was responsible for informing his siblings of the diagnosis.

¶ 83    Defendant testified that plaintiff had a long period of estrangement from the grantor and that the grantor was also intermittently estranged from Jim. Defendant testified that he had a conversation with the grantor on December 31, 2011, at the grantor's Arizona home, in which the grantor discussed plaintiff's and Jim's inheritances. The grantor suggested disinheriting plaintiff, and defendant disagreed with the suggestion. The grantor also suggested postponing Jim's right to the trust assets until he turned 60, and defendant again disagreed, instead suggesting that his withdrawal be postponed until such time that the grantor's obligations to his spouses were discharged.

¶ 84    Defendant testified that, during his last visit with the grantor, he drafted the second amendment to the trust. The grantor did not have copies of the original trust agreement or the first amendment, so defendant worked off of the grantor's recollection of the terms; the grantor received copies of the trust documents only at the end of the second amendment's drafting

- 17 -

process, so defendant was able to examine them only briefly. In the course of drafting the amendment, defendant discovered that the Arizona and Michigan properties were not trust assets, so he drafted two deeds to transfer the properties into the trust, which the grantor and Dorothy executed.

¶ 85 Defendant testified that he attempted to appease the "difficult personalities" of his siblings and Dorothy. First, he settled with Dorothy, after which he sold the Arizona home and placed the proceeds into the trust. Next, he sold the Michigan home, thereby removing all non-income-producing assets from the trust and leaving only liquid assets. Following the sale of the Michigan home, Jim and Susan "really put on the pressure they wanted to be bought out," and defendant settled with both of them as soon as he could. Defendant testified that he approached every decision he made as trustee in good faith.

¶ 86                                                  D. Trial Court Ruling

¶ 87 After the trial, the court instructed both parties to submit proposed findings of fact and conclusions of law, which they did. On December 21, 2018, the trial court entered a 48-page memorandum opinion and order, finding in plaintiff's favor on count II of the complaint.[11] As this order is at issue on appeal, we discuss it in considerable detail.

¶ 88 The trial court found that the terms of the second amendment restricted the grantor's children from withdrawing the principal of the trust while the obligations to Marjorie and Dorothy remained outstanding; the court noted that defendant acknowledged at trial that this language applied to him, as well. However, the court found that defendant's payments to the children involved distributions of principal, not just trust income, while the obligation to Marjorie remained outstanding. The trial court found that defendant admitted during trial that he made payments of trust principal and that there was no particular relationship between the net income of the trust and the amount distributed to his siblings during his time as trustee. The court found that in 2012, 2013, and 2014, defendant made distributions that were in excess of the trust's income. The court also found that, in 2012, 2013, and 2014, defendant's distributions to his siblings were not equal.

¶ 89 The trial court found that, prior to 2015, both Jim and Susan sought a full distribution of their interests in the trust. Jim suggested purchasing an annuity to resolve the remaining obligations to Marjorie, but defendant rejected that suggestion in May 2013. At approximately the same time, Susan sought to have her inheritance placed into an independent trust as her sole property, but while defendant professed to being open to such discussions, he expressed concern about doing so in view of his obligations to treat beneficiaries equally and the alleged purposes of the trust. Jim retained an attorney and, after the Michigan home was sold in October 2014, sought to further pursue a complete resolution of his interest in the trust.

¶ 90 The court found that, ultimately, defendant entered into a settlement agreement with Jim in March 2015, under which Jim was distributed a 25% share of the IRA, along with a sum reflecting (1) a 25% share of the trust account and (2) $14,000, which represented " 'the amount necessary to equalize the amount of past discretionary distributions to Jim with the average amount of past discretionary distributions to all four beneficiaries of the Trust' " plus

_____

[11]The court also found in plaintiff's favor on defendant's counterclaim for promissory estoppel, finding that defendant had failed to provide sufficient evidence to support his claim. However, the counterclaim is not at issue on appeal, so we need not discuss the court's findings on that issue in depth.

another $14,000, " 'which represents the estimated income tax liability Jim will incur as a result of the payments under this agreement,' " minus a " 'Reduction Amount' " of $54,000, representing 25% of the estimated present value of Marjorie's support obligation. The agreement purported to fully satisfy the trust's obligations to Jim.

¶ 91    The court found that, following the settlement with Jim, defendant contacted Susan to inform her of the settlement, telling her that it was " 'natural' " to afford her the same opportunity. Defendant sent Susan a proposed settlement agreement and entered into a settlement agreement with her that, like Jim's, distributed her funds from both the IRA and trust account. The settlement with Susan called for her to receive one third of the IRA balance, which reflected the fact that three children remained as beneficiaries of the trust. The settlement also provided that Susan would receive a proportionate share of the remaining assets, excluding the $54,000 " 'Reduction Amount' " withheld from Jim's distribution, minus her own $54,000 " 'Reduction Amount,' " plus a payment relating to her resulting tax liabilities. While Susan had, at this point, received more in distributions than her siblings and Jim's settlement accounted for this difference by affording him an additional sum as compensation, Susan's distribution was not correspondingly reduced to address the larger distributions. Like Jim's, Susan's settlement terminated her interest in the trust.

¶ 92    The court found that, following Jim's settlement with the trust, he contacted plaintiff to offer financial support because he was suspicious of defendant. Jim offered to help with plaintiff's legal fees, and plaintiff retained an attorney, who requested information from defendant. Defendant's first response to the attorney was to provide financial documentation through December 2014, which did not show the settlements to Jim or Susan. After the attorney informed defendant that he was aware of the settlements and asked why plaintiff was not offered a settlement, defendant provided updated financial documentation reflecting the settlement payments, as well as an additional $52,554 in distributions that defendant had made to himself during the first six months of 2015.

¶ 93    The court found that, on September 22, 2015, plaintiff's counsel again wrote to defendant, seeking an explanation of the unequal distributions of the trust assets, noting that the trust required a *per stirpes* distribution. Defendant responded that the trust documents concerted plaintiff to an " 'income-only beneficiary' " because plaintiff had no children and asserted that the trust documents did not require *per stirpes* distributions but afforded defendant discretion to distribute principal. Counsel again wrote to defendant to clarify defendant's position, and defendant confirmed his interpretation of the trust documents. At trial, defendant testified that, even after the obligation to Marjorie was satisfied, plaintiff would have no right to principal and, absent a discretionary distribution of principal to plaintiff, defendant would be a " 'remainder beneficiary' " of any principal not distributed to plaintiff and would consequently receive any remaining principal upon plaintiff's death. After defendant's communications with plaintiff's attorney, plaintiff filed the instant lawsuit.

¶ 94    The court found that, between January 1, 2015, and June 2017, the total amount distributed to beneficiaries exceeded the trust income. Defendant made monthly payments of $1500 to plaintiff and made monthly payments of $1000 to himself. Defendant also made additional distributions to himself totaling $75,854.

¶ 95    The court found that defendant never filed an independent claim for declaratory relief concerning his obligations under the trust but did file a motion for summary judgment on count I of the complaint in October 2016, in which he sought a declaration that plaintiff had no right

to demand distributions of principal, that plaintiff had a right to demand distributions of income only, and that, as trustee, defendant had the discretion but not the obligation to make principal distributions. The court noted that it denied defendant's motion for summary judgment on June 30, 2017. In so doing, the court "noted that the Trust instruments' language did not eliminate the obligation to distribute per the language of the principal Trust document, but that the discretion to distribute was eliminated."

¶ 96    The court found that, less than a month after the ruling on summary judgment, on July 27, defendant transferred $291,000 from the trust account into an account he had opened at TD Ameritrade after the filing of the lawsuit and also transferred a total of $193,983 from the IRA into an IRA in his own name. The court noted that defendant claimed that this distribution reflected his intention to " 'be on parity' " with the distributions he had previously made to Jim and Susan, but found that this distribution differed from the previous distributions. The court found that the settlements with Jim and Susan called for a distribution of the child's proportionate share of the IRA and a proportionate distribution of the trust account, adjusting to account for amounts held back for Marjorie and, in Jim's case, to address prior disproportionate distributions. However, defendant's July 2017 distribution did not follow this formula but instead took a less than proportionate share of the IRA and a more than proportionate share of the trust account. The court found that a *pro rata* share of the IRA would have been $313,562.19, but that defendant distributed himself $193,983, resulting in an " 'underpayment' " of $119,579.19 from the IRA. The court also found that, according to its calculations, defendant would have been entitled to a distribution of $170,377.99 from the trust account, but distributed to himself $291,000, resulting in an " 'overpayment' " of $120,622.01 from the trust account. While the overpayment from the trust account and the underpayment from the IRA essentially canceled each other out, the trial court found that defendant's choice to take more from the trust account and less from the IRA worked to his benefit because of the deferred tax liabilities associated with the IRA's assets. The court found that, instead of taking a tax liability of $78,529.01, defendant assumed a tax liability of only $49,063, leaving an additional $26,466.01 in tax liabilities for the trust. The court further found that, after Jim and Susan settled with the trust, they were no longer allocated income from the trust but that defendant continued to allocate himself an interest in the trust's income and losses and continued to claim an interest in the principal of the trust should plaintiff die.

¶ 97    The court also found that, in addition to the distributions he received as a beneficiary, defendant also paid himself for investment advisory and legal fees. The court found that, in October 2012, defendant, as trustee, executed an investment advisory agreement with Advantage Advisory Group, defendant's advisory firm, in which the firm received a quarterly fee based upon a percentage of the value of the account. Between 2013 and the time of trial, defendant's investment advisory firm received fees from the trust totaling $71,407.38. The court further found that defendant had charged the trust for legal services that he had provided through his firm, Advantage Law Group, which included sums charged by him for time spent litigating the instant lawsuit, including amounts spent drafting his dismissed counterclaims and stricken pleadings; the court found that, in reviewing the bills from 2015 through 2017, "virtually all of the time charged by Advantage Law related to [defendant's] defense of this case." The court found that, by its calculations, $26,837.48 of the $31,499 charged to the trust by defendant's firm was for legal services directly related to the instant litigation. The court noted that defendant had never sought a declaration of his right to fees. The court also found

that defendant paid his counsel in the instant action with trust funds and that plaintiff's attorney fees had not similarly been paid by the trust.

¶ 98    After setting forth these findings of fact, the trial court made additional findings of fact specific to the claims at issue. The court first found that, in its grant of summary judgment on count I of the complaint, the court found that the unambiguous terms of the second amendment did not alter plaintiff's rights to a *per stirpes* distribution of principal upon the satisfaction of the trust's obligations to Marjorie and Dorothy. The court found that the first amendment provided for an immediate distribution of the trust's principal and income to the grantor's descendants *per stirpes* upon the grantor's death. The court found that,

> "[w]hile Paragraph 3 of the Second Amendment postponed this obligation by providing that the trustee 'shall not be obligated to distribute principal' (and that no child had the right to 'withdraw' principal) so long as the obligations to Dorothy and Marjorie remained outstanding, Paragraph 4 (which would apply to a child without children) did not address 'distribution' at all, providing instead a restriction on 'withdrawal' akin to that imposed on all children by Paragraph 3."

In a footnote, the court noted that the parallel withdrawal restrictions in paragraphs 3 and 4 "are not necessarily superfluous." The court noted that the first amendment had provided that distributions were to be made to the grantor's " 'descendants' " who survived him and that paragraph 4 may have been intended to address the rights of the grantor's grandchildren to obtain their shares of principal in the event of need. However, the court also noted that this circumstance was not present in the instant case.

¶ 99    The court found that the second amendment precluded distributions of principal from being made to any child while the obligations to Marjorie and Dorothy remained outstanding. The court found that "Paragraph 3 of the Second Amendment plainly provided that 'no child of the grantor shall have the right to withdraw principal' while any of the obligations to the Grantor's spouses are outstanding. The provision provided for no exceptions, nor did its terms afford any discretion to the trustee to alter the provision's effect." The court found that the only support provided by defendant for his claim of discretion was a grant of discretion contained in article III, paragraph 2, of the original trust agreement, but the first amendment expressly replaced these portions of the original trust agreement and, even under that provision, the discretion granted to the trustee applied only until the grantor's children had reached age 25, with the children entitled to a full distribution of their trust share at age 30.

¶ 100   The court noted that, while paragraph 3 of the second amendment's article III did not provide for a grant of discretion, paragraph 1 did and would have permitted defendant to purchase an annuity or otherwise resolve the trust's obligations to Marjorie. At that point paragraph 3's restriction would have been removed, and defendant would have been obligated under the first amendment to distribute the remaining assets among his siblings *per stirpes*. The court found that "[a]bsent a resolution with Marjorie, however, the Trust's terms did not permit [defendant] to distribute principal to himself or to his siblings."

¶ 101   The court also discussed the extrinsic evidence presented concerning the circumstances surrounding the drafting of the second amendment, noting that defendant testified that the grantor informed him that he wanted to amend the trust to disinherit plaintiff and to postpone Jim's withdrawal of principal. However, the court found that this contention concerning the grantor's supposed intent was contrary to the language of the amendment itself, which did not alter plaintiff's rights to a *per stirpes* distribution of assets and that even defendant did not

dispute that paragraph 3 applied equally to all of the grantor's children, even himself and Susan. The court also noted that, at the time that defendant drafted the second amendment, he was an attorney with over 10 years of experience, with 20% of his practice devoted to trusts, wills, and other estate documents. The court found that "[defendant] understood that the language chosen for the Second Amendment was not a matter of chance, and that the document would be the sole written record of his conversations with [the grantor]."

¶ 102    The court noted that defendant attempted to resolve this inconsistency by claiming that he did not have the prior trust documents available until the end of his time with the grantor. However, the court found that other documents executed at the same time, including the grantor's will and a general assignment, referenced that certain personal property would be divided equally among the grantor's children, without singling any out; the court found that these contemporaneous documents also did not support defendant's claim that the grantor intended to disadvantage either plaintiff or Jim.

¶ 103    The court further found that defendant's claims concerning the grantor's wishes were only expressed relatively recently and were inconsistent with statements he made concerning the trust prior to any controversies. For instance, in June 2012, approximately six months after the grantor's death, plaintiff asked for copies of the trust documents and asked defendant to confirm that he was a beneficiary and his share of the trust. Defendant confirmed that plaintiff had a 25% interest in the trust; defendant admitted at trial that he did not qualify this statement by telling plaintiff that he was not entitled to principal distributions. Similarly, Jim testified that it was only after he suggested purchasing an annuity for Marjorie in order to effectuate a full distribution of the trust that defendant claimed paragraph 3 was intended to delay distributions to Jim. The court also noted that, in settling with Jim and Susan, "it was plainly [defendant], not his siblings, who suggested a settlement that would afford Jim a one-quarter share of the Trust's principal, rather than the one-third share that would have been his due had [plaintiff] been entitled to income alone."

¶ 104    The court also found that defendant's assertions concerning the circumstances leading up to the grantor's purported wish to treat plaintiff and Jim differently were disputed by other witnesses who testified at trial, noting that both plaintiff and Jim disputed the suggestion that either was estranged from the grantor at the time of his death, and that, while both of them had testified to periods of estrangement, both denied any estrangement during the time before his death. Both also testified that the grantor had been generous in offering them financial assistance, and Jim testified that, at the time of his marriage to Dorothy, the grantor had expressly advised Jim that each of his children was to receive an equal share of his property. Jim testified that the grantor never suggested any change of intent and that, at Jim's final visit, the grantor expressed his pleasure at plaintiff's prior visit. The court found that "[a]gainst that background, it seems unlikely that [the grantor] intended the contemporaneous alteration of his Trust instruments to disfavor either [plaintiff] or Jim." The court found:

> "Accordingly, given the terms of the Second Amendment and contemporaneous documents, [defendant's] own prior statements concerning the Trust, and the contrary testimony concerning the circumstances surrounding [the grantor's] death, the Court does not credit [defendant's] testimony that [the grantor] actually intended the Second Amendment to impose special restrictions on [plaintiff] or Jim's ability to receive principal. Rather, as set forth in the terms of the Second Amendment itself, [the

grantor's] apparent intent was to preclude any of his children from receiving the Trust's principal until the obligations to Marjorie and Dorothy were satisfied."

¶ 105 The court also addressed plaintiff's contention that defendant breached the fiduciary duties owed to him as a beneficiary of the trust, finding that defendant "was plainly aware at all times of his duties as trustee," based on his legal experience and his repeated statements in correspondence and at trial concerning his duties. However, "[defendant's] distributions of Trust principal to his siblings were not only impermissible under the Trust's terms, but were also plainly unequal." The court noted that defendant claimed at trial that he attempted to make distributions equally, pointing to equal distributions made during the first six months of his service, but found that, "even if the Court gives credit to that statement, the statement does not negate [defendant's] conduct over the subsequent six years."

¶ 106 The court noted that defendant claimed that his unequal distributions to plaintiff were justified because plaintiff did not make the same demands for distributions and was subject to additional withdrawal restrictions. However, the court found that the terms of the second amendment did not require, or even permit, distributions to be made on demand and that paragraph 3 "plainly provided that no child had a right to withdraw principal, irrespective of demand." The court further found that the additional restriction imposed on plaintiff by paragraph 4 was no different than the restriction imposed in paragraph 3 and that both restricted the right to withdraw principal. The court also noted that defendant testified that he did not tell plaintiff about distributions made to other beneficiaries and that he generally did not tell the beneficiaries about distributions made to their siblings. The court further noted, however, that he did share such information with Susan, informing her about distributions made to defendant and to Jim.

¶ 107 The court also found unpersuasive defendant's claim that the trust documents "placed him in a no-win situation" because the other beneficiaries bore him ill will. The court found that "[defendant's] suggestion that the Trust instruments placed him in an impossible position ignores both the options available to him as trustee and the extent to which [defendant's] decisions benefitted himself." The court noted that he could have discharged the obligation to Marjorie, leaving him free to make the distributions demanded by his siblings, but chose not to do so. The court further noted that defendant also continued to receive fees both as an attorney and investment advisor to the trust, fees that he would collect so long as the trust remained in place. Finally, the court noted that defendant's claim that he was forced into distributions by his siblings ignored the distributions he made to himself. The court also noted that defendant never sought a declaration of his rights under the trust, claiming that it would have been unduly expensive, but that this claim ignored defendant's participation in the instant litigation, where he could have sought such a declaration. Defendant also sought to shield himself from an adverse ruling after his motion for summary judgment was denied, withdrawing the balance of his interest in the trust after the entry of the order. The court found that defendant also sought to conceal this distribution to the extent possible, delaying and objecting to discovery requests. The court found:

> "For the reasons set forth above, the Court does not credit [defendant's] testimony that his actions as trustee were performed in good faith or were the result of compulsion. To the contrary, the Court finds that [defendant's] actions—particularly in making distributions and payments to himself—willfully violated obligations of impartiality among beneficiaries and constituted acts of self-dealing."

¶ 108    After making its findings of fact, the trial court set forth its conclusions of law. The court found that defendant breached his fiduciary duty to plaintiff in several respects. First, the court found that defendant failed to administer the trust according to its terms, making distributions to himself and to his siblings in violation of the trust documents. Second, the court found that defendant breached his duty of impartiality, treating individual beneficiaries differently despite the requirement that he be impartial. The court found that, despite the fact that all of the siblings were subject to the restriction on withdrawal set forth by the second amendment's article III, paragraph 3, defendant not only disregarded that restriction but also allowed different beneficiaries to take different distributions of principal. Defendant also relied on paragraph 4 to support his refusal to make distributions to plaintiff, which the trial court found was "a position that discriminated between classes of beneficiaries" by enforcing one set of restrictions but not the other. The trial court also found that,

> "while claiming that he was the subject of unfair demands from his siblings and their contentions that were at odds with his own view of the Trust, and asserting a claim that would have allowed him to claim [plaintiff's] share of the Trust upon his death, [defendant] at no point sought court instructions as to his duties, and indeed disregarded the guidance provided by the denial of the summary judgment motion so as to protect his own interests."

¶ 109    Finally, the court found that defendant had engaged in self-dealing and that his decisions with respect to the trust consistently benefitted himself. The court found that defendant's distributions to himself were greater to those he made to Jim or plaintiff and that his July 2017 distribution to himself gave him a tax advantage that had not been granted to Jim or Susan and also continued to allow him to claim an interest in the trust. The court found that defendant did not share information about his distributions with the other beneficiaries and affirmatively sought to conceal the July 2017 distribution for months. The court also found that defendant's service as an investment advisor created a conflict of interest with the trust, since he received a benefit from failing to resolve Marjorie's claims. Finally, the court found that defendant had charged the trust for his legal fees in the instant litigation and that "[s]uch payments are plainly improper." The court found that defendant's breaches of duty not only deprived the trust of principal that was wrongfully distributed in contravention of the trust's terms but also deprived plaintiff of the equal distribution of trust assets owed to him.

¶ 110    As remedies for defendant's breaches, the trial court first removed defendant as trustee, replacing him with the successor trustee. Next, the trial court ordered defendant to "restore sums wrongfully taken from the Trust." The court noted that, where funds were improperly released from a trust, the trustee must return that amount, as the trustee is personally liable for any loss occasioned by a violation of his duties as trustee. The court found:

> "As set forth above, virtually all of [defendant's] payments to himself from the Trust were in derogation of its terms or otherwise improper. [Defendant] repeatedly distributed principal to his siblings and himself in violation of the Trust's terms, improperly paid himself legal fees associated with the defense of this action and paid himself advisory fees that he would not have been able to collect had he satisfied Marjorie's claims prior to distributing principal to [the grantor's] children. Each of these sums should properly be restored to the Trust."

¶ 111    The trial court also found that defendant was required to reimburse the trust for the fees that he paid to defend plaintiff's claim against him, as such claims were personal expenses that were not properly chargeable to the trust. The court noted that it previously found that

- 24 -

$26,837.48 of legal fees charged to the trust by defendant were attributable to the instant litigation and ordered those fees restored to the trust and then distributed to plaintiff and defendant *per stirpes*. The court also barred defendant from collecting any additional legal fees incurred that had not already been billed to the trust. The court similarly ordered defendant to return to the trust investment advisory fees dating from his May 2013 rejection of Jim's suggestion of the annuity purchase. The court found that, "[a]t that juncture, [defendant] should properly have made a final distribution to all parties, including Marjorie, and by failing to do so he claimed additional years of fees." The court ordered defendant to return $63,266.07 for investment advisory fees paid from July 1, 2013, through the date of trial, and upon restoration to the trust, those sums would be distributed to plaintiff and defendant *per stirpes*. The court also barred defendant and his firm from collecting any further advisory fees from the trust.

¶ 112    Finally, the court found that it "must fashion a proper remedy for [defendant's] improper distributions of principal." The court found that, according to defendant's own calculations, he had distributed a total of $2,400,538 to the beneficiaries, of which only $121,975 was income. Of that sum, defendant distributed $763,899 to himself, of which $51,926 was income. Plaintiff received distributions of $132,500, of which $51,926 was income, and was distributed a total of $631,399 less than defendant distributed to himself. The court found:

> "It would be manifestly inequitable to allow [defendant] to retain additional principal distributions prematurely made to himself, particularly if [plaintiff] was required to await a payment of other sums due him as the result of [defendant's] breaches of fiduciary duty. While [defendant] could properly be required to restore to the Trust the full $631,399, the Court notes that [defendant's] most egregious act of self-dealing was the distribution to himself of $484,983 in July 2017—a distribution he acknowledged was made to avoid the effect of an adverse judgment. [Citation.] [Defendant] is accordingly ordered to restore the $484,983 sum to the Trust. The sum is to be held in the Trust pending the payment of such further claims as are provided for in this judgment. [Defendant] shall be entitled to reclaim those funds minus any amounts owed to [plaintiff] following resolution of Marjorie's support obligation."

The trial court further ordered, "given [defendant's] conduct in attempting to conceal the transfers of Trust funds in his own accounts and subsequent dissipation of funds from those accounts," that defendant account for all distributions and payments made to himself for the duration of his term as trustee.

¶ 113    With respect to plaintiff, the trial court found that plaintiff was entitled to an equal share of the trust assets and that defendant's breach of fiduciary duty had damaged plaintiff by denying him his equal share of trust assets. Using the same formula used in Jim and Susan's distributions, the trial court found that plaintiff would be entitled to $256,023.94 as of July 31, 2018. The court noted that it could "conceivably" order these sums distributed to plaintiff, along with the $29,466.01 tax liability resulting from defendant's failure to take a proportionate distribution from the IRA. However, the court chose instead to grant declaratory relief to plaintiff, because defendant's distribution of trust assets prior to resolving Marjorie's support obligation left her at risk. Under those circumstances, the court modified its prior declaration on count I in order to resolve plaintiff's entitlement to trust funds and effectuate the *per stirpes* distribution required by the trust. The court ordered:

> "[Plaintiff] is declared to be currently entitled to all remaining assets of the IRA Account, along with a payment from [defendant] of the $29,466.01 in additional tax

liabilities. The trustee is directed to effectuate a reasonable resolution of the Trust's obligations to Marjorie as quickly as practicable and shall thereafter cause the remaining balance of the Trust Account to be distributed to [plaintiff] (less any additional amounts collected from [defendant] in accordance with the foregoing paragraphs, which shall be distributed as set forth therein). To the extent the amount available at the time of distribution is less than $256,023.94, [plaintiff] shall be entitled to recover the difference from [defendant]."

¶ 114    Finally, the trial court found that plaintiff was entitled to an award of punitive damages but was not entitled to a separate award of attorney fees. With respect to punitive damages, the court found:

"As set forth above, the evidence indicates [defendant's] actions were neither merely inadvertent nor negligent, but rather were willful violations of his fiduciary duties. [Defendant] distributed principal to himself in violation of the Trust instruments and ultimately—by his own admission—intentionally withdrew over $400,000 from the Trust to protect himself from a potentially adverse judgment. Having bowed to other siblings' demands for a distribution, [defendant] then took the position that he was entitled to the entirety of the Trust principal, forcing [plaintiff], who could only hire a lawyer to address his rights in the Trust with Jim's financial support, to file this action. [Defendant] also sought to conceal Trust information from the beneficiaries, including his July 2017 withdrawal. As with numerous other examples in this case, [defendant's] actions have increased the cost and length of this matter to [plaintiff's] detriment.

The Court finds that [defendant] has acted in willful breach of his fiduciary duties and that an award of punitive damages is warranted. Particularly since [defendant's] intentional, willful breaches of his fiduciary duty principally damaged [plaintiff] by requiring him to expend sums to pursue this action, the Court finds that the over $150,000 in fees paid prior to trial constitute a proper basis for calculating those damages. For these reasons, [plaintiff] is awarded punitive damages in the amount of $250,000 from [defendant]."

¶ 115    In sum, the trial court ordered as follows: (1) judgment was entered in favor of plaintiff and against defendant on count II of the complaint and on the counterclaim; (2) defendant was removed as trustee of the trust, with a successor trustee to be appointed pursuant to the terms of the trust, and defendant was ordered to pay any institutional trustee fees and reasonable attorney fees paid by any successor trustee in administering the trust; (3) defendant was ordered to restore to the trust $484,983 in sums wrongfully distributed to him; (4) defendant was ordered to disgorge $26,837.48 in legal fees and $63,266.07 in investment advisory fees to the trust; (5) defendant was ordered to render an accounting of all sums distributed to himself from the trust; (6) the successor trustee was ordered to effectuate a reasonable resolution of the trust's obligations to Marjorie as quickly as practicable and to thereafter cause the remaining balance of the trust account and the IRA to be distributed to plaintiff, along with a payment from defendant of the $29,466.01 in additional tax liabilities, less any additional amounts collected from defendant in accordance with the order, and, to the extent the sum was less than $256,023.94 following Marjorie's distribution, plaintiff was entitled to recover the difference from defendant; (7) defendant was ordered to pay plaintiff $250,000 in punitive damages; and

(8) plaintiff was awarded his costs of suit.

¶ 116                                    V. Posttrial Proceedings
¶ 117        Defendant filed a notice of appeal on January 4, 2019, seeking reversal of the trial court's orders concerning both counts of the complaint.[12] On January 18, 2019, defendant filed a motion to modify the judgment. The disposition of the motion to modify the judgment is not contained in the record on appeal, but an exhibit to a motion to stay enforcement filed before this court shows that the motion was denied on April 5, 2019, and this appeal follows.

¶ 118                                            ANALYSIS
¶ 119        On appeal, defendant challenges both the trial court's April 25, 2018, order granting summary judgment in plaintiff's favor on count I of the complaint and the December 21, 2018, order in favor of plaintiff following the bench trial on count II of the complaint. We consider each argument in turn.

¶ 120                                 I. Count I Summary Judgment
¶ 121        Defendant first claims that the trial court erred in granting summary judgment in plaintiff's favor on count I of the complaint. A trial court is permitted to grant summary judgment only "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2016). The trial court must view these documents and exhibits in the light most favorable to the nonmoving party. *Home Insurance Co. v. Cincinnati Insurance Co.*, 213 Ill. 2d 307, 315 (2004). We review a trial court's decision to grant a motion for summary judgment *de novo*. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992). *De novo* consideration means we perform the same analysis that a trial judge would perform. *XL Specialty Insurance Co. v. Performance Aircraft Leasing, Inc.*, 2019 IL App (1st) 181031, ¶ 62. Summary judgment is appropriate in a case involving the construction of a trust, because the ascertainment of the trust's meaning or intent is strictly a matter of law. *BMO Harris Bank N.A. v. Towers*, 2015 IL App (1st) 133351, ¶ 27.
¶ 122        "Summary judgment is a drastic measure and should only be granted if the movant's right to judgment is clear and free from doubt." *Outboard Marine Corp.*, 154 Ill. 2d at 102. However, "[m]ere speculation, conjecture, or guess is insufficient to withstand summary judgment." *Sorce v. Naperville Jeep Eagle, Inc.*, 309 Ill. App. 3d 313, 328 (1999). The party moving for summary judgment bears the initial burden of proof. *Nedzvekas v. Fung*, 374 Ill. App. 3d 618, 624 (2007). The movant may meet his burden of proof either by affirmatively showing that some element of the case must be resolved in his favor or by establishing " 'that there is an absence of evidence to support the nonmoving party's case.' " *Nedzvekas*, 374 Ill. App. 3d at 624 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). " 'The purpose of summary judgment is not to try an issue of fact but *** to determine whether a triable issue of fact exists.' " *Schrager v. North Community Bank*, 328 Ill. App. 3d 696, 708 (2002) (quoting *Luu v. Kim*, 323 Ill. App. 3d 946, 952 (2001)). We may affirm on any basis appearing in the record,

_____

[12]Plaintiff filed a notice of cross-appeal on January 18, 2019, appealing the denial of an award of attorney fees, but is not pursuing the cross-appeal.

whether or not the trial court relied on that basis or its reasoning was correct. *Ray Dancer, Inc. v. DMC Corp.*, 230 Ill. App. 3d 40, 50 (1992).

¶ 123    In the case at bar, defendant claims that the trial court erred in granting summary judgment in plaintiff's favor on count I of the complaint because it did not properly interpret the trust documents to effectuate the grantor's intent in treating plaintiff differently than his siblings. "In interpreting trusts, which are construed according to the same principles as wills, the goal is to determine the settlor's intent, which the court will effectuate if it is not contrary to law or public policy." *Citizens National Bank of Paris v. Kids Hope United, Inc.*, 235 Ill. 2d 565, 574 (2009) (citing *First National Bank of Chicago v. Canton Council of Campfire Girls, Inc.*, 85 Ill. 2d 507, 513 (1981)). " 'General rules of construction of written instruments apply to the construction of trust instruments, whether they are contracts, deeds, or wills.' " *In re Estate of Agin*, 2016 IL App (1st) 152362, ¶ 19 (quoting *Storkan v. Ziska*, 406 Ill. 259, 263 (1950)).

¶ 124    "When the language of the document is clear and unambiguous, a court should not modify or create new terms." *Ruby v. Ruby*, 2012 IL App (1st) 103210, ¶ 19 (citing *Fifth Third Bank, N.A. v. Rosen*, 2011 IL App (1st) 093533, ¶ 24). "However, where the language of a trust is ambiguous and the settlor's intent cannot be determined, a trial court may rely on extrinsic evidence to aid construction." *Ruby*, 2012 IL App (1st) 103210, ¶ 19 (citing *Rosen*, 2011 IL App (1st) 093533, ¶ 24). Language is ambiguous when it is reasonably susceptible to more than one meaning. *Thompson v. Gordon*, 241 Ill. 2d 428, 441 (2011).

¶ 125    We begin our analysis, then, by examining the language of the trust itself. As noted, the original trust agreement was amended twice, by the first amendment and the second amendment. In the original trust agreement, article III governed the distribution of the trust's assets after the grantor's death. As relevant to the instant appeal, paragraph 2 of the original article III provided:

> "[T]he trustee may in its discretion pay to or use for the benefit of the Grantor's descendants so much of the income and principal as the Trustee determines to be required, in addition to their respective incomes from all other sources known to the trustee, for their reasonable support, comfort and education, adding any excess income to principal at the discretion of the trustee. The trustee may make payments to, or for the benefit of, one or more of them to the exclusion of one or more of them, and may exhaust the principal. The Grantor's concern is primarily for the support, comfort and education of his descendants, rather than the preservation of principal for distribution upon termination of the trust. After the death of Grantor and after there is no living child of Grantor under the age of twentyone [*sic*] years, the trustee shall divide the principal, as then constituted, and any undistributed income, into separate trusts, equal in value, one for each then living child of Grantor and one for the then living descendants, collectively, of each deceased child of Grantor."

Paragraph 2 then set forth a formula for distributions, based on the child's age. In summary, until the child was 25, he or she would be entitled to receive trust income in the trustee's discretion; upon turning 25, the trustee was required to make distributions of trust income to the child at regular intervals. After the child turned 25, he or she would also be entitled to request distributions of trust principal, with certain dollar limitations imposed prior to age 27 and age 30.

¶ 126    The first amendment to the trust agreement, dated May 1, 1995, amended article III of the trust agreement. Specifically, the amendment substituted a new paragraph 1, which now

provided that the trustee was to distribute $100,000 to Western Michigan University. Additionally, the amendment substituted a new paragraph 2, which now provided:

> "The trustee shall distribute the remaining trust principal and any undistributed trust income to the Grantor's descendants that survive him, per stirpes."

¶ 127    The second amendment to the trust agreement, dated January 2, 2012, again amended article III of the trust agreement. The second amendment provided that "Article III of the Agreement, as amended by the First Amendment, shall remain in full force and effect, subject to the following modifications." First, the new article III provided for the support of both Marjorie and Dorothy. Additionally, the new article III contained the two paragraphs at issue in the instant litigation:

> "3. Notwithstanding any provision of the Trust Agreement or the First Amendment to the contrary, the trustee shall not be obligated to distribute principal, and no child of the Grantor shall have the right to withdraw principal, while any of the foregoing obligations to the Grantor's spouses are outstanding.
>
> 4. Notwithstanding any provision of the Trust Agreement or the First Amendment to the contrary, no child of the Grantor shall have the right to withdraw principal, unless such child is the legitimate, inside of wedlock, parent of a living descendant of the Grantor."

The second amendment ended by providing that, "[e]xcept as modified by this Second Trust Amendment, I reaffirm and ratify the Trust Agreement and the First Amendment."

¶ 128    On appeal and throughout the litigation below, defendant has expressly acknowledged that the trust documents require the division of the trust's assets into equal shares for each child, and it appears that he has, in fact, done so in his capacity as trustee. Thus, we need not further discuss that initial point.[13] However, defendant also claims that, even though plaintiff technically has an equal share of the trust's assets, plaintiff is not entitled to actually *receive* those assets, based on the language of the second amendment's article III, paragraph 4, which he maintains was inserted into the trust documents in order to effectuate the grantor's intent to restrict plaintiff's access to trust principal. We do not find this argument persuasive.

¶ 129    It is clear that paragraph 4 applies only to plaintiff as a factual matter, since he is the only child of the grantor who does not have children of his own, and the parties do not dispute this point.[14] However, there is nothing in the language of paragraph 4 that prevents plaintiff from

---

[13]In his brief on appeal, plaintiff appears to draw a distinction between the language of the original trust agreement, which provided for a "division" of the trust's assets into equal shares, and the first amendment, which provided that the trustee "shall distribute" the trust assets to the grantor's descendants "*per stirpes*." He uses this distinction to suggest that defendant is incorrect in asserting that the trust provided for a "division" of trust assets. While we understand plaintiff's larger point about his right to distributions, we cannot fault defendant for his use of the term "division" here, since distributing assets *per stirpes* necessarily involves dividing those assets. See *In re Estate of Agin*, 2016 IL App (1st) 152362, ¶ 24.

[14]We note that, while the parties operate on the assumption that this will always be true, because plaintiff's cancer resulted in his inability to have children, if plaintiff was to adopt a child, that child would likely satisfy the conditions of paragraph 4. See 755 ILCS 5/2-4(e) (West 2018) (an adopted child is deemed a child born to the adopting parent for the purpose of determining the property rights

being entitled to his share of the trust's assets. Article III, paragraph 2, of the first amendment provides, in no uncertain terms:

> "The trustee shall distribute the remaining trust principal and any undistributed trust income to the Grantor's descendants that survive him, per stirpes."

Under this provision, the trustee was obligated to distribute the trust's assets to *each* of the grantor's children *equally*. See Black's Law Dictionary 1181 (8th ed. 2004) (defining "*per stirpes*" as "[p]roportionately divided between beneficiaries according to their deceased ancestor's share").

¶ 130 The second amendment's article III placed restrictions on this obligation through paragraphs 3 and 4. Paragraph 3 provided that the trustee's obligation to distribute principal would not be triggered while the obligations to Marjorie and Dorothy remained outstanding and that none of the grantor's children would have the right to withdraw principal in that case. Paragraph 4 did not address the trustee's obligation to distribute but provided that none of the grantor's children would have the right to withdraw principal unless they had children of their own. Since the obligation to Marjorie remained outstanding at the time of the instant litigation, paragraph 3 applied to all of the children, meaning that none of them had the right to withdraw principal and defendant had no obligation to distribute trust principal to them. Once that obligation was satisfied, only paragraph 4 would remain as a restriction on the trustee's obligation to distribute. However, as noted, paragraph 4 does not address the trustee's obligation to distribute but only addresses plaintiff's right to withdraw. Thus, the first amendment's obligation for the trustee to distribute the trust's assets would come into full effect.

¶ 131 Defendant claims that paragraph 4 *did* address his obligation to distribute the trust assets, arguing that the obligation to distribute and the right to withdraw were, essentially, two sides of the same coin and that the omission of language concerning the obligation to distribute was insignificant. Defendant claims that, if the beneficiary had no right to withdraw principal, the trustee had no obligation to distribute said principal. However, defendant provides no support for this claim and cites no legal authority. The trust documents do not contain any requirement that the trustee's obligation to distribute principal must be initiated by a demand for a withdrawal from a beneficiary. Instead, the first amendment unambiguously imposes the affirmative obligation on the trustee to make the distributions. Additionally, defendant's position ignores the well-settled law that a court should construe a trust so that no language used by the grantor is treated as surplusage or rendered void or insignificant. See, *e.g.*, *Harris Trust & Savings Bank v. Donovan*, 145 Ill. 2d 166, 172 (1991). Defendant's argument that these two terms should be interpreted identically would render the two provisions in paragraph 3 as duplicative. Clearly, "withdraw" and "distribute" must mean different things.

¶ 132 We are similarly unpersuaded by defendant's claim that, in drafting the second amendment, he did not mean for the terms to be interpreted differently and that the missing phrase in paragraph 4 is "no more than a scrivener's error resulting from minor inadvertence." At the time of drafting the second amendment, defendant had been an attorney for 10 years, and his practice involved drafting estate documents. He was aware that the terms used in the trust documents would have legal significance. His self-serving claim that the use of different

---

of any person under an instrument unless the contrary intent is demonstrated by the terms of the instrument by clear and convincing evidence).

language in similar provisions of the trust should be ignored is unpersuasive. Moreover, his attempt to dismiss the omission of a restriction on distributions in paragraph 4 as a mere scrivener's error is also not persuasive. This does not appear to be a scrivener's error. It may be poor drafting on defendant's part, but it is not the type of change that can be overlooked in determining the grantor's intentions.

¶ 133    In the case at bar, paragraph 4 only restricts plaintiff's ability to demand a withdrawal of trust principal. It has no effect on the affirmative obligation set forth in the first amendment's article III, paragraph 2, which required defendant, as trustee, to "distribute the remaining trust principal and any undistributed trust income to the Grantor's descendants that survive him, per stirpes." Accordingly, once the restriction set forth in the second amendment's article III, paragraph 3, was removed via the resolution of the obligations to Marjorie, defendant was required to distribute plaintiff's equal share of the trust's assets to him, regardless of whether he first made a demand for its withdrawal. Consequently, the trial court properly granted summary judgment on this count of the complaint and properly found that plaintiff was entitled to a 25% share of the trust's assets, which defendant was obligated to distribute to plaintiff and him alone.

¶ 134    Defendant claims that this reading renders paragraph 4 meaningless. We do not find this argument persuasive. There are several ways to read paragraph 4 in such a way that it is not meaningless. Plaintiff identified several of them in his response to defendant's initial motion for summary judgment, and the trial court also noted a possible reason for its inclusion in its December 21, 2018, order. Indeed, paragraph 4 may be read simply as addressing a timing issue: the trust contained a number of assets, including improved real estate, that could have taken considerable time to convert into liquid assets that could then be distributed. Paragraph 4 could be interpreted to restrict plaintiff's ability to demand a withdrawal of principal during this interim time period. Accordingly, we cannot agree that paragraph 4 is rendered meaningless simply because defendant is required to distribute plaintiff's share of the trust assets to him without a demand.

¶ 135    We also find unpersuasive defendant's claim that paragraph 4 was ambiguous and that the trial court should not have granted summary judgment without attempting to ascertain the grantor's intent. When the language of a trust is clear, the court should not modify the document or create new terms. *Schroeder v. Sullivan*, 2018 IL App (1st) 163210, ¶ 27. However, when a term is ambiguous, the court may rely upon rules of construction to ascertain the donor's intent. *Schroeder*, 2018 IL App (1st) 163210, ¶ 27. "It is well established that 'ambiguity can be found only if the language is reasonably or fairly susceptible to more than one interpretation.' " *Schroeder*, 2018 IL App (1st) 163210, ¶ 27 (quoting *Stein v. Scott*, 252 Ill. App. 3d 611, 615 (1993)). Here, the term "right to withdraw" is not ambiguous. While the parties provide different interpretations of *why* that language was included in the trust documents, there is no reasonable reading of the language of the trust documents other than its plain meaning.[15]

---

[15] Defendant claims that plaintiff was estopped from claiming paragraph 4 was unambiguous because he had previously argued, in opposition to defendant's first motion for summary judgment, that the inclusion of the term did not have a clear meaning. However, plaintiff's arguments there again went towards possible explanations for why the provision was included.

¶ 136    Defendant claims that the ambiguity is a latent one, evident only from examining the circumstances surrounding the execution of the second amendment. "A latent ambiguity occurs where the language employed is clear and intelligible and suggests but a single meaning, but some extrinsic fact or extraneous evidence creates a choice among two or more possible meanings." *Koulogeorge v. Campbell*, 2012 IL App (1st) 112812, ¶ 24 (citing *Hays v. Illinois Industrial Home for the Blind*, 12 Ill. 2d 625, 628 (1958)). Defendant claims that the latent ambiguity arises because there are two possible interpretations of paragraph 4:

"(1) Plaintiff argues omission of the phrase 'no obligation to distribute' is significant and means the Trustee is obligated to distribute to beneficiaries regardless of the condition precedent (so Art.III.4 is surplusage); whereas (2) [defendant] argues omission of the phrase 'no obligation to distribute' is insignificant because the Trustee is still not obligated under Art.III.4 to distribute to beneficiaries who have no right to withdraw."

This is not a latent ambiguity. This is merely an attempt at rearguing the two points defendant argued that we have discussed above—that the omission of the language is insignificant and that the trustee had no obligation to distribute absent a demand for withdrawal. As we have noted, neither of these arguments is persuasive, and combining them together does not result in an ambiguity.

¶ 137    Defendant also claims that the "[o]verwhelming [e]vidence" proved that the grantor intended to treat plaintiff differently than the other trust beneficiaries. We note that plaintiff *is* treated differently under paragraph 4—he is not entitled to demand withdrawals, including while the trustee is in the process of making final distributions of the trust's assets. Moreover, the evidence presented by defendant's testimony surrounding the circumstances of the drafting of the second amendment could not be undisputed, as defendant claims it was, or overwhelming. However, it was not necessary to the case at bar given the plain language of the trust documents, which show the clear intentions of the grantor. Accordingly, we affirm the trial court's grant of summary judgment on count I of the complaint.

¶ 138                                    II. Count II

¶ 139    Defendant also challenges the trial court's December 21, 2018, decision and order finding in favor of plaintiff on count II of the complaint. In a bench trial, the trial court has the opportunity to weigh the evidence and make findings of fact, and a reviewing court will defer to the findings of the trial court unless they are against the manifest weight of the evidence. *Eychaner v. Gross*, 202 Ill. 2d 228, 251 (2002). "A decision is against the manifest weight of the evidence only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence." *Eychaner*, 202 Ill. 2d at 252. "A reviewing court should not overturn a trial court's findings merely because it does not agree with the lower court or because it might have reached a different conclusion had it been the fact finder." *Bazydlo v. Volant*, 164 Ill. 2d 207, 214 (1995). " 'The court on review must not substitute its judgment for that of the trier of fact.' " *Eychaner*, 202 Ill. 2d at 252 (quoting *Kalata v. Anheuser-Busch Cos.*, 144 Ill. 2d 425, 434 (1991)). A reviewing court has only a cold record in which to govern its decision-making process. See *Racky v. Belfor USA Group, Inc.*, 2017 IL App (1st) 153446, ¶ 107.

¶ 140    As an initial matter, defendant takes issue with the fact that the trial court's order adopted plaintiff's proposed findings of fact and conclusions of law. However, the fact that the trial court did so does not diminish its order in any way or render its findings or conclusions worthy

of any less deference. See *Shapiro v. Regional Board of School Trustees of Cook County*, 116 Ill. App. 3d 397, 403-04 (1983). " '[T]hose findings, though not the product of the workings of the [trial] judge's mind, are formally [the judge's]; they are not to be rejected out-of-hand, and they will stand if supported by evidence.' " *Shapiro*, 116 Ill. App. 3d at 403 (quoting *United States v. El Paso Natural Gas Co.*, 376 U.S. 651, 656 (1964)). Defendant's suggestions otherwise and his claim that plaintiff's attorney was "the Judgment's *de facto* author and fact finder" are nonproductive and inappropriate. Moreover, the trial court in this case made a number of changes to the proposed findings of fact and conclusions of law to reflect its own findings and conclusions, and we find no error in the way it drafted its order, which was based on the evidence.

¶ 141    Additionally, defendant also repeatedly characterizes plaintiff's counsel's actions during the underlying litigation as "malicious," demonstrating "pervasive dishonesty," and even "fraudulent." We recognize that defendant is appearing *pro se* during the instant appeal and is emotionally involved, but defendant is a practicing attorney, who should be well aware that all of his inflammatory language is inappropriate and nonproductive in a court proceeding. The conduct pointed out by defendant concerning plaintiff's counsel reflects counsel's zealous representation of his client. Accusing one's opposing attorney of perpetrating a fraud on a court is a serious matter when there is no evidence to support the accusations. Plaintiff's counsel is not a party to this matter. The issues concern the propriety of defendant's conduct in administering the grantor's trust, and defendant's arguments should be focused on the legal merits of the trial court's order, not spent attacking opposing counsel.

¶ 142    We turn, then, to the merits of defendant's arguments, where he challenges a number of the trial court's findings of fact and several of its conclusions of law. Defendant first claims that the trial court erred in finding that the grantor did not intend the second amendment to disfavor plaintiff or Jim. The trial court found:

> "given the terms of the Second Amendment and contemporaneous documents, [defendant's] own prior statements concerning the Trust, and the contrary testimony concerning the circumstances surrounding [the grantor's] death, the Court does not credit [defendant's] testimony that [the grantor] actually intended the Second Amendment to impose special restrictions on [plaintiff] or Jim's ability to receive principal. Rather, as set forth in the terms of the Second Amendment itself, [the grantor's] apparent intent was to preclude any of his children from receiving the Trust's principal until the obligations to Marjorie and Dorothy were satisfied."

¶ 143    This court cannot find this finding to be against the manifest weight of the evidence. The trial court was not required to believe defendant's testimony concerning the grantor's intent in drafting the second amendment. Moreover, the trial court explained the evidence that supported its conclusion: the terms of the second amendment and the contemporaneous documents, defendant's own prior statements concerning the trust, and contrary testimony concerning the circumstances surrounding the grantor's death. Defendant acknowledges that there is support in the record for all of this evidence but claims that it is "cherry-pick[ed]" to reach this conclusion. As noted, we must defer to the findings of the trial court unless they are against the manifest weight of the evidence. *Eychaner*, 202 Ill. 2d at 251. In the case at bar, we cannot say that the findings of the trial court were "unreasonable, arbitrary, or not based on the evidence" (*Eychaner*, 202 Ill. 2d at 252), since they were amply supported by the evidence and trust documents that were not ambiguous and had clear meanings. Additionally, defendant's

- 33 -

claims that the trial court ignored unrebutted evidence that the grantor intended paragraphs 3 and 4 to restrict the withdrawal rights of plaintiff and Jim are merely a rehash of the issues disposed of on summary judgment. The trial court did not err in repeating the same finding in its order after a full and complete trial on the merits.

¶ 144 Defendant also claims that the trial court erred in finding that he breached his fiduciary duties to plaintiff, claiming plaintiff failed to establish each element of the cause of action. "[A] trustee owes a fiduciary duty to a trust's beneficiaries and is obligated to carry out the trust according to its terms and to act with the highest degrees of fidelity and utmost good faith." (Internal quotation marks omitted.) *Fuller Family Holdings, LLC v. Northern Trust Co.*, 371 Ill. App. 3d 605, 615 (2007). To state a cause of action for breach of fiduciary duty, a plaintiff must allege and ultimately prove (1) a fiduciary duty on the part of the defendant, (2) a breach of that duty, (3) damages, and (4) a proximate cause between the breach and the damages. *Herlehy v. Marie V. Bistersky Trust*, 407 Ill. App. 3d 878, 896 (2010).

¶ 145 Defendant does not dispute that he owed plaintiff a fiduciary duty as trustee of a trust under which plaintiff was a beneficiary. However, defendant claims that the trial court erred in finding that he had breached his duty. Defendant first claims that the trial court applied its rulings to him "retroactively," resulting in breaches that he did not realize were inappropriate at the time.[16] However, all that the trial court did in interpreting the trust was to set forth what the trust already provided; it did not add any new or different terms. The fact that defendant had a different interpretation of those terms that was ultimately shown to be incorrect does not suggest that the trial court applied a ruling "retroactively." Indeed, as the trial court noted, if defendant wanted a firm declaration as to his rights and powers, he had the ability to file a declaratory judgment action at any time to clarify them.

¶ 146 Defendant also claims that the trial court's finding that he had breached his duty of loyalty was based on finding that he had breached several "non-existent legal duties applied retroactively." Specifically, defendant claims that he had no duty to avoid making distributions to himself, to resolve a conflict of interest in being trustee and contingent beneficiary, to refrain from collecting fees for his duties, to purchase an annuity, to seek a declaratory judgment, to make *pro rata* distributions to himself from both the IRA and trust accounts, or to notify beneficiaries about distributions to other beneficiaries or himself. We do not find any of these arguments persuasive. Defendant fails to recognize that each of these actions are not independent duties but instead are examples of conduct that defendant engaged in that together resulted in the trial court finding that defendant had breached his duty of loyalty. As the trial court found, "[defendant's] decisions with respect to the Trust consistently benefitted himself." As a result, it was not against the manifest weight of the evidence to conclude that all of these decisions resulted in a breach of his fiduciary duty.

¶ 147 We also note that defendant mischaracterizes some of the court's findings in this respect. For instance, defendant did not have a "duty" to purchase an annuity. The trial court instead noted that, had defendant resolved Marjorie's obligations when Jim suggested it, defendant would have properly been free to distribute the trust's assets instead of violating the trust's terms by making the distributions while the obligations remained outstanding. The court also

---

[16]We note that defendant does not argue that the trial court incorrectly found that he violated paragraph 3 by making distributions prior to resolving Marjorie's interest in the trust. Defendant only claims that this finding contradicted an earlier statement made by plaintiff's counsel in a motion.

found that it was in defendant's interest *not* to do so because, by keeping the trust open, defendant continued to collect investment advisory fees. It was these issues in total that led to the finding of the breach of the fiduciary duty, not merely the imposition of a "duty" to purchase the annuity.

¶ 148 Defendant also claims that the trial court erred by finding that the breaches were willful, arguing that they appeared permissible to him when they were committed. However, the trial court had the opportunity to observe defendant on the witness stand, as well as reading the voluminous financial records and correspondence admitted in evidence as exhibits in the instant case. We will not substitute our judgment for that of the trial court with respect to its finding as to defendant's knowledge and intent. See *Eychaner*, 202 Ill. 2d at 252 (" 'The court on review must not substitute its judgment for that of the trier of fact.' " (quoting *Kalata*, 144 Ill. 2d at 434)). As we have previously stated, defendant is a seasoned attorney whose practice involves the field of estate planning, wills, and trusts.

¶ 149 Finally, defendant claims that the trial court's order contained no findings or conclusions that plaintiff suffered any damages or that those damages were proximately caused by defendant's breaches of fiduciary duty. We also do not find this argument persuasive. "When a trustee breaches a trust agreement, whether wilfully, negligently, or by oversight, he is liable for any loss to the estate resulting from the breach and must place the beneficiaries in the position they would have held had the breach not occurred." *Progressive Land Developers, Inc. v. Exchange National Bank of Chicago*, 266 Ill. App. 3d 934, 942 (1994).

> "Specifically, a trustee in violation of the trust is chargeable with (1) any loss or depreciation in value of the trust estate as a result of the breach; or (2) any profit made by him as a result of the breach; or (3) any profit which would have accrued to the trust estate had there been no breach of trust." *Progressive Land Developers*, 266 Ill. App. 3d at 942-43.

In the case at bar, the trial court found that defendant's breaches deprived the trust of principal that was wrongfully distributed and also deprived plaintiff of the equal distributions owed to him under the trust documents. The trial court further found that defendant was the recipient of fees to which he was not entitled and that he had made distributions to himself in such a way as to leave the trust with tax liabilities with respect to the IRA that should have been assumed by him. Thus, defendant's argument that the trial court failed to find that plaintiff had been damaged by defendant's conduct is not persuasive.

¶ 150                                                 III. Damages

¶ 151 The final issue in the instant appeal is the trial court's damages award, specifically, its award of punitive damages. "Punitive damages 'are not awarded as compensation, but serve instead to punish the offender and to deter that party and others from committing similar acts of wrongdoing in the future.' " *Slovinski v. Elliott*, 237 Ill. 2d 51, 57-58 (2010) (quoting *Loitz v. Remington Arms Co.*, 138 Ill. 2d 404, 414 (1990)). They may be awarded "when the defendant's tortious conduct evinces a high degree of moral culpability, that is, when the tort is 'committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others.' " *Slovinski*, 237 Ill. 2d at 58 (quoting *Kelsay v. Motorola, Inc.*, 74 Ill. 2d 172, 186 (1978)). "To determine whether punitive damages are appropriate, 'the trier of fact can properly consider the character of the defendant's act, the nature and extent of the harm to the

plaintiff that the defendant caused or intended to cause and the wealth of the defendant.' " *Slovinski*, 237 Ill. 2d at 58 (quoting Restatement (Second) of Torts § 908(2) (1979)). However, because they are penal in nature, punitive damages are not favored under the law, and courts must take caution to ensure that they are not improperly or unwisely awarded. *Slovinski*, 237 Ill. 2d at 58.

¶ 152    Punitive damages awards are permitted for a breach of a fiduciary duty. *Tully v. McLean*, 409 Ill. App. 3d 659, 670 (2011). The trial court's factual determination that defendant acted willfully and that aggravating factors exist are reviewed under the manifest-weight standard of review. *Tully*, 409 Ill. App. 3d at 670. However, the trial court's ultimate determination that punitive damages should be awarded is reviewed for an abuse of discretion. *Tully*, 409 Ill. App. 3d at 672. " 'An abuse of discretion occurs where no reasonable person would agree with the position adopted by the trial court.' " *Tully*, 409 Ill. App. 3d at 672 (quoting *Schwartz v. Cortelloni*, 177 Ill. 2d 166, 176 (1997)).

¶ 153    In the case at bar, we cannot say that the trial court abused its discretion in determining that an award of punitive damages was appropriate. The court found:

> "As set forth above, the evidence indicates [defendant's] actions were neither merely inadvertent nor negligent, but rather were willful violations of his fiduciary duties. [Defendant] distributed principal to himself in violation of the Trust instruments and ultimately—by his own admission—intentionally withdrew over $400,000 from the Trust to protect himself from a potentially adverse judgment. Having bowed to other siblings' demands for a distribution, [defendant] then took the position that he was entitled to the entirety of the Trust principal, forcing [plaintiff], who could only hire a lawyer to address his rights in the Trust with Jim's financial support, to file this action. [Defendant] also sought to conceal Trust information from the beneficiaries, including his July 2017 withdrawal. As with numerous other examples in this case, [defendant's] actions have increased the cost and length of this matter to [plaintiff's] detriment."

Consequently, the court found that "[defendant] has acted in willful breach of his fiduciary duties and that an award of punitive damages is warranted." The conduct as set forth by the trial court supports an award of punitive damages, and we cannot find its decision to award such damages to be an abuse of discretion.

¶ 154    We also find unpersuasive defendant's contention that a punitive damages award violates his due process rights under the fourteenth amendment. In determining whether a punitive damages award violates the constitution, we are required to consider three "guideposts," namely, " '(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the [factfinder] and the civil penalties authorized or imposed in comparable cases.' " *International Union of Operating Engineers, Local 150 v. Lowe Excavating Co.*, 225 Ill. 2d 456, 470 (2006) (quoting *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 418 (2003)). Defendant's arguments as to these "guideposts" merely repeats his claims that the trial court's findings were against the manifest weight of the evidence, especially concerning his willfulness and the damages suffered by plaintiff, and provide no basis for finding that an award of punitive damages would violate his constitutional rights.

¶ 155    Finally, the trial court set the amount of the punitive damages award at $250,000. The court explained its award as follows:

"Particularly since [defendant's] intentional, willful breaches of his fiduciary duty principally damaged [plaintiff] by requiring him to expend sums to pursue this action, the Court finds that the over $150,000 in fees paid prior to trial constitute a proper basis for calculating those damages. For these reasons, [plaintiff] is awarded punitive damages in the amount of $250,000 from [defendant]."

¶ 156     We review the trial court's computation of the amount of punitive damages to determine whether the amount was excessive or the result of passion, partiality, or corruption. *Tully*, 409 Ill. App. 3d at 673. "The amount of the award should be a reflection of the court's determination as to the degree of maliciousness evidenced by defendants' actions." *Tully*, 409 Ill. App. 3d at 673 (citing *Gambino v. Boulevard Mortgage Corp.*, 398 Ill. App. 3d 21, 69 (2009)). In the case at bar, the trial court found that it would be appropriate to require defendant to pay the over $150,000 that plaintiff had expended in attorney fees. However, the trial court then imposed an additional $100,000 in punitive damages, without explaining the basis for the additional sum in the award. We find no error in the trial court's conclusion that defendant should be required to bear the cost of plaintiff's litigation as a punitive damages award and remand the cause to the trial court to determine the precise amount of those attorney fees. However, because there is no explanation for the additional damages, we find that the damages in excess of the attorney fees are against the manifest weight of the evidence and vacate that portion of the punitive damages award. However, as discussed above, we affirm the trial court's judgment in all other respects.

¶ 157     As a final matter, during this appeal, plaintiff filed a motion for sanctions against defendant, and we ordered the motion taken with the case. Plaintiff sought sanctions under Illinois Supreme Court Rule 375(b) (eff. Feb. 1, 1994), which provides for sanctions for frivolous appeals or for appeals that were not taken in good faith. We apply an objective standard to determine whether an appeal is frivolous, considering whether it would have been brought in good faith by a reasonable, prudent attorney. *Parkway Bank & Trust Co. v. Korzen*, 2013 IL App (1st) 130380, ¶ 87. In the case at bar, we cannot find that the instant appeal was frivolous or brought in bad faith and, accordingly, deny plaintiff's motion for sanctions. We similarly deny the motion for sanctions, filed by defendant on October 10, 2019.

¶ 158                                    CONCLUSION

¶ 159     For the reasons set forth above, we affirm the trial court's grant of summary judgment on count I of the complaint, because the language of the trust documents provides that plaintiff was entitled to a 25% share of the trust assets and that defendant was obligated to distribute those assets to him. We also affirm the trial court's judgment in plaintiff's favor on count II of the complaint because the trial court's finding that defendant breached his fiduciary duty to plaintiff was not against the manifest weight of the evidence. Finally, we affirm the trial court's award of punitive damages to the extent that it equals plaintiff's attorney fees in the instant litigation, but we vacate any award in excess of that amount, as the trial court did not set forth a basis for such an award. The cause is remanded to the trial court for determination of the amount of plaintiff's attorney fees.

¶ 160     Affirmed in part and vacated in part; cause remanded.